PARTIDO SOCIALISTA PUERTORRIQUEÑO, ETC., PARTIDO POPULAR DEMOCRÁTICO, ETC., PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO representado por su Presidente, RUBÉN BERRÍOS MARTÍNEZ, demandantes y apelantes, v. GOBERNADOR CARLOS ROMERO BARCELÓ, GERINELDO BARRETO PÉREZ ET AL., demandados y apelados.

*Número:* O-80-550   *Resuelto:* 27 de octubre de 1980*

---

(*)NOTA DEL COMPILADOR: Mediante la correspondiente Resolución, el Tribunal Supremo de Puerto Rico ordenó la sustitución de "la opinión certificada en este caso de fecha 17 de octubre de 1980 por la opinión Per Curiam que se acompaña", fechada 27 de octubre de 1980.

*Ludmilia Rivera Burgos, Reynaldo Pérez,* abogados del Partido
Socialista Puertorriqueño; *Luis Rivera Lacourt, David No-
riega* y *Francisco Vicenty,* abogados del Partido Independen-
tista Puertorriqueño; *Héctor M. Laffitte, Héctor Reichard,
Jr.,* y *Oreste Ramos,* abogados de los apelados; *Pedro E.
Ortiz Álvarez, Carlos R. Ríos, Alcides Oquendo, Guillermo
Mojica Maldonado* y *Francisco Aponte Pérez,* abogados del
Partido Popular Democrático; *Miguel A. Pagán, Eunice Sein
Llompart* y *José A. Carlo,* abogados del Administrador Gene-
ral de Elecciones y del Secretario Estatal de Elecciones;
*Héctor A. Colón Cruz, Procurador General,* y *Héctor Urgell
Cuevas,* abogados del Hon. Gobernador Carlos Romero Bar-
celó y del Estado Libre Asociado de Puerto Rico.

PER CURIAM: Se confronta el Tribunal con la delicada
tarea de determinar, a la luz de varias disposiciones de la
Constitución del Estado Libre Asociado de Puerto Rico, la
constitucionalidad de los procesos electorales a utilizarse
durante las elecciones generales a celebrarse el próximo 4 de
noviembre. Impugnan en específico los apelantes el procedi-
miento especial de votación dispuesto por la Ley Núm. 3 de
8 de septiembre de 1980.(1) Dicho procedimiento resulta

---

(1) Dispone su Sec. 9 lo siguiente:

Sección 9. "Procedimiento especial de votación para la elección general
del 4 de noviembre de 1980:

"Siguiendo el procedimiento que a continuación se expresa, tendrá
derecho a votar en la elección general que se celebrará el 4 de noviembre
de 1980 todo elector debidamente inscrito aún cuando no presente su tar-
jeta de identificación electoral.

"(a) Todo elector debidamente inscrito que al momento de votar no
pueda presentar su tarjeta de identificación electoral deberá firmar bajo

especial, por cuanto modifica para las próximas elecciones el sistema de colegio abierto, dispuesto en la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977 (16

juramento una declaración jurada en la que se hará constar su nombre y apellidos, que es el elector que aparece inscrito, con indicación de la página y línea en la que aparece su nombre en la lista correspondiente al colegio en el cual ejerce su derecho al voto y las razones por las cuales necesita y desea votar sin tarjeta de identificación electoral y declarando que no ha votado en otro colegio electoral en esas elecciones. Si el elector no supiere firmar o no pudiere hacerlo por razón de algún impedimento físico, éste o la persona que lo haga a su ruego, marcará el formulario haciendo constar su nombre en letra de molde y su número de identificación electoral antes de firmar como testigo de la marca.

"La Comisión Estatal de Elecciones diseñará e imprimirá un formulario a estos efectos. El Administrador General de Elecciones enviará los referidos formularios a cada colegio electoral como parte del material electoral, conforme lo dispuesto en los Artículos 5.026 y 5.027 de la 'Ley Electoral de Puerto Rico'.

"El juramento requerido deberá ser prestado ante la Junta de Colegio Electoral y los inspectores de ese colegio firmarán el formulario. Los inspectores de colegio quedan por la presente facultados para tomar dicho juramento.

"Si el elector se negare a prestar el juramento, el Director del Colegio de Votación deberá certificar tal hecho en cada caso bajo su firma, marcando la papeleta al dorso con la palabra 'Recusada', seguida de una breve anotación, también firmada por él, exponiendo el fundamento de la recusación, el nombre del elector, su número de identificación electoral, el municipio o precinto y el número del Colegio de Votación, y dichos votos no se adjudicarán en el escrutinio del Colegio.

"Todo elector que firme bajo juramento la declaración antes mencionada a sabiendas de que lo declarado es falso, incurrirá en el delito de perjurio y convicto que fuere, será sancionado con pena de reclusión por un término mínimo de un año y máximo de diez años.

"(b) Los colegios electorales estarán abiertos para recibir a los electores a los efectos de votar, desde las nueve (9:00) de la mañana hasta las tres (3:00) de la tarde del día de votación. Ninguna persona podrá entrar al colegio después de las tres (3:00) de la tarde.

"Todo elector cuyo nombre hubiere sido incluido en la lista general de votantes y tuviere su tarjeta de identificación electoral, podrá votar en colegio abierto en cualquier momento desde las nueve (9:00) de la mañana hasta las (3:00) de la tarde del día de votación.

"Todo elector cuyo nombre hubiere sido incluido en la lista general de votantes que no tuviere su tarjeta de identificación electoral podrá votar en su colegio después que voten todos los electores que tuvieren tarjeta electoral, una vez se haya cerrado el colegio a las tres (3:00) de la tarde.

"La votación de electores continuará hasta que todos los que estén en el colegio electoral a las tres (3:00) de la tarde hayan votado."

L.P.R.A. sec. 3001 y ss.), al permitir el ejercicio del voto sin la presentación de la tarjeta de identificación electoral requerida por esta ley. Arts. 2.009 y 5.029 (16 L.P.R.A. secs. 3059 y 3229). El sistema dispuesto por la disposición impugnada contempla la votación de algunos electores en colegio abierto, haciendo uso de sus tarjetas de identificación entre las 9:00 de la mañana y las 3:00 de la tarde, y la votación de otros electores sin el uso de dicha tarjeta, una vez cerrados los colegios a las 3:00 de la tarde.

Los fundamentos aducidos por los apelantes son los siguientes. Sostienen, en primer término, que el derecho al voto igual, consagrado en la Sec. 2 del Art. II de nuestra Constitución,(²) requiere que cualquier sistema de votación dispuesto por la Asamblea Legislativa para los comicios generales contenga garantías suficientes para evitar la dilución del voto como resultado del fraude electoral, requisito con el cual, a su juicio, no cumple el sistema especial de votación dispuesto por la Ley Núm. 3. Arguyen, además, que la garantía sobre igual protección de las leyes contenida en la Sec. 7 del Art. II(³) requiere, por otro lado, que todo sistema de votación general sea uniforme, de modo que todos los electores tengan la oportunidad de votar de la misma forma, exigencia con la cual tampoco cumple la mencionada ley. Por último, el Partido Independentista Puertorriqueño impugna por su parte —en el supuesto de sostenerse la constitucionalidad del procedimiento eleccionario especial antes mencionado— aquella parte del Art. 5.036 de la Ley Electoral, 16 L.P.R.A. sec.

---

(²) "Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral."

(³) "Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo."

3236,(⁴) que exige de los funcionarios de colegio de los distintos partidos el uso de sus tarjetas de identificación electoral como condición indispensable para votar. En vista de que el procedimiento especial antes descrito dispensa el uso de dicha tarjeta en cuanto a los electores que no son funcionarios de colegio, tal requisito —aduce el apelante— viola los derechos a la libre asociación e igual protección de las leyes garantizados por las Secs. 6 y 7(⁵) del Art. II de nuestra Constitución.

En varias vistas celebradas ante el tribunal de instancia, las partes presentaron extensa prueba para sostener sus alegaciones. Luego de apreciada dicha prueba, el tribunal hizo constar en su sentencia los hechos que pasamos a exponer a continuación.

El Registro del Cuerpo Electoral cuenta en la actualidad con un total de 2,070,049 electores inscritos. De ese total, y por variadas razones, sólo 1,518,313 electores acudieron a ser fotografiados para la expedición de sus correspondientes tarjetas de identificación electoral. Del número de electores que en efecto acudieron, al 28 de agosto de 1980, 336,133 aún no habían recibido sus tarjetas. Para remediar la grave situa-

---

(⁴) Artículo 5.036. "Votación de Funcionarios de Colegio.

Una vez terminada la votación en un colegio y sólo entonces, procederán a votar allí en forma secreta, los funcionarios asignados al colegio, siempre que sean electores inscritos del precinto en que estén ejerciendo como tales, tengan consigo y presenten a los demás miembros de la Junta de Colegio su tarjeta de identificación electoral y su nombramiento. De no aparecer sus nombres en la lista de votantes correspondiente al colegio en que estén prestando servicios, éstos se inscribirán en dicha lista, con expresión del cargo oficial que desempeñen, el número de su tarjeta de identificación electoral, su descripción personal y el número del colegio o precinto en que figura su inscripción. Dichos votos serán recusados pero se contarán y no será necesario cumplimentar la contradeclaración requerida en ley para los casos de recusación del voto de un elector.

"Estas anotaciones se harán en una página especial que al efecto será incluida al final de la lista de votantes."

(⁵) Sec. 6:

"Las personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares."

ción provocada por la existencia de un número tan crecido de electores inscritos que por no tener dichas tarjetas no podrían ejercer su voto en las elecciones ya próximas, la Ley Núm. 3 de 8 de septiembre de 1980 fue aprobada. El Registro del Cuerpo Electoral, por otro lado, contiene un número considerable de posibles asientos duplicados, o sea, correspondientes a un solo elector, así como asientos que corresponden a personas ya fallecidas. La determinación exacta del número de tales asientos, sin embargo, resultó imposible a base de la prueba presentada. Con razonable probabilidad, sin embargo, existen de 25,000 a 50,000 asientos defectuosos por las razones antes apuntadas. Todos los partidos políticos han tenido ante sí las listas electorales parciales desde 1978, y las listas electorales finales desde el 4 de septiembre de 1980. Finalmente, el P.I.P. ha conseguido 15,174 electores dispuestos a ser funcionarios de colegio, de los cuales 3,305 no poseen tarjeta de identificación electoral.

Teniendo como base los hechos anteriormente señalados, el tribunal sentenciador concluyó, como cuestión de derecho, que la Sec. 9 de la Ley Núm. 3 de 8 de septiembre de 1980 no viola las disposiciones de la Sec. 2 del Art. II de nuestra Constitución. Consideró que los Arts. 2.023, 2.023A, 2.024, 2.025 y 5.034 de la Ley Electoral, 16 L.P.R.A. secs. 3073–3075 y 3234, así como el requisito provisto en la propia sección impugnada de declarar bajo juramento el no haber votado anteriormente en otro colegio electoral, unido a las disposiciones penales contenidas en esa misma sección y en la Sec. 10 de dicha Ley Núm. 3, limitan la posibilidad de fraude y ofrecen suficientes garantías en cuanto a la pureza del proceso electoral a celebrarse el 4 de noviembre próximo. ([6]) En cuanto a

---

([6]) El tribunal de instancia no hizo determinación específica en cuanto al planteamiento de igual protección de las leyes. Evidentemente lo consideró incluido en el ataque formulado a base del derecho al voto igual. Nos parece, sin embargo, que debía haber sido considerado por separado. El hecho de que no fuera así, claro está, no quiere decir que la sentencia

la impugnación del requisito de tener tarjeta de identificación electoral, que la Sec. 5.036 exige a los funcionarios de colegio como condición para poder ejercer su voto, el tribunal de instancia resolvió que no se había demostrado fuese irrazonable o que afectara en forma sustancial los derechos de los partidos políticos. En consecuencia, rechazó la impugnación formulada. Es de estas determinaciones que recurren a nosotros los apelantes.

## I. *Cuestiones preliminares*

El presente recurso en efecto plantea cuestiones constitucionales sustanciales al amparo de la Constitución del Estado Libre Asociado de Puerto Rico, según requiere para el ejercicio de nuestra jurisdicción apelativa la Sec. 14 de la Ley de la Judicatura, 4 L.P.R.A. sec. 37. *Soltero Peralta* v. *Srio. de Hacienda*, 86 D.P.R. 26, 28 (1962); *Ortiz* v. *Burgos*, 85 D.P.R. 42, 44–45 (1962). Por otro lado, no han levantado los apelados, ni hemos advertido nosotros, objeción alguna sobre la naturaleza justiciable de la controversia planteada, o la capacidad de los apelantes para promoverla. *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84 (1980); *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590, 595–596 (1978); *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750, 759–762 (1977). La controversia está, por tanto, debidamente ante nosotros. Pasamos a resolverla.

## II. *El voto igual*

■ La Sec. 2 del Art. II de la Constitución del Estado Libre Asociado dispone que las leyes electorales aprobadas por la Asamblea Legislativa garantizarán que la expresión de la voluntad del pueblo se manifieste mediante el sufragio igual. Dentro de la gama de posibles situaciones en que quedaría violado este principio general de que cada ciudadano tiene derecho a un voto, ciertamente queda incluida, a nues-

---

tenga que ser revocada. De existir fundamentos adecuados para rechazarlo, procedería confirmarla. *Collado* v. *E.L.A.*, 98 D.P.R. 111, 114 (1969); *Alum Torres* v. *Campos del Toro*, 89 D.P.R. 305, 324 *in fine* (1963).

tro juicio, aquella en que por medio del fraude —cualquiera que éste sea— se altera en detrimento del cuerpo electoral general el peso proporcional de todos los votos correctamente emitidos. Por consiguiente, puede quedar vulnerada dicha cláusula, cuando los procedimientos dispuestos para regular determinada consulta electoral permiten que se cometa fraude.

■ El ataque constitucional en tales casos puede intentarse sin necesidad de la celebración del evento eleccionario. No vemos razón lógica que obligue a delimitar el ámbito de protección de dicha cláusula a meramente remedial. El carácter claramente afirmativo del texto constitucional sostiene, por el contrario, la conclusión de que sus propósitos no quedarían completamente servidos de no dársele contenido preventivo o cautelar. Conclusión que se apoya, además, en las normas dispuestas en la Sec. 19 del Art. II([7]) para la interpretación de nuestra Constitución y su Carta de Derechos. Véase, Informe de la Comisión de Carta de Derechos, *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. 1961, T. 4, págs. 2575–2576. Aceptado tal contenido preventivo, menester es precisar su alcance.

■ Anteriormente hemos reconocido que la Asamblea Legislativa deriva de la Sec. 4 del Art. VI de la Constitución "un amplísimo margen de autoridad para legislar en asuntos de materia electoral". *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741, 744 (1976).([8]) La fijación, pues, que del alcance de la Sec. 2 se haga no puede montar a un menoscabo de tal

([7]) Sec. 19:

"La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo."

([8]) *Cf.* "Informe de la Comisión de Disposiciones Transitorias y Asuntos Generales sobre asuntos Generales", *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. 1961, T. 4, pág. 2621.

autoridad. Por otro lado, la fundamental importancia del sufragio dentro del sistema democrático en que ha ordenado su vida colectiva el pueblo de Puerto Rico es manifiesta. *Ortiz Angleró* v. *Barreto Pérez*, ante; *Giménez* v. *J.E.E.*, 96 D.P.R. 943, 947 (1968). La cláusula constitucional expresamente dirigida a garantizar ese derecho no puede quedar sin contenido, como ciertamente quedaría si el margen de autoridad de la Asamblea Legislativa, para ordenar y regular el ejercicio de la franquicia electoral fuese absoluto. [9]

En atención, por tanto, a la debida armonización de los intereses aquí contrapuestos, el ámbito de protección preventiva que a este respecto ofrece la Sec. 2 del Art. II, a nuestro entender debe quedar enmarcado por la probabilidad fundada de fraude.

Tornando a la controversia planteada en el presente caso, surge que la impugnación de la Sec. 9 de la Ley Núm. 3 de 1980 se fundó en la alegación de los apelantes de que el sistema especial de votación así ordenado por dicha sección permite la doble votación, por cuanto nada hay en ella que impida que un elector vote utilizando su tarjeta de identificación electoral entre las 9:00 de la mañana y las 3:00 de la tarde, y vote luego una segunda vez, después de cerrados los colegios a las 3:00 de la tarde, haciendo uso de otro asiento de inscripción. Para sustanciar la gravedad de la situación demostraron ante el tribunal de instancia que el Registro del Cuerpo Electoral contiene de 25,000 a 50,000 asientos defectuosos que corresponden a personas ya fallecidas, o a electores con otros asientos de inscripción, y que pueden, por ende, ser utilizados para votar una segunda vez. Procede analizar el planteamiento de los apelantes a la luz del criterio constitucional antes expuesto.

---

[9] En efecto, durante los debates de la Asamblea Constituyente se discutió, si bien desde una perspectiva que no incluye la controversia específicamente ante nosotros, el balance que entre estas dos secciones es necesario reconocer. Véase *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. 1961, T. 3, págs. 2072–2076.

■ Considerando el número de posibles asientos defectuosos establecido por la prueba (de 25,000 a 50,000) y advirtiendo el número de colegios que habrán de utilizarse en los próximos comicios (de los autos se desprende que serán 9,000 aproximadamente), resulta reducida la cantidad de posibles asientos defectuosos por colegio, en comparación con el número total de electores asignado a cada uno de ellos (aproximadamente 225, según consta en autos).([10]) Por otro lado, se desprende de los hechos probados en instancia que la mayor parte del electorado habrá de votar haciendo uso de la tarjeta de identificación electoral, por lo que puede afirmarse que el número de personas que habrá de votar luego de cerrados los colegios a las 3:00 de la tarde será, con toda probabilidad, un número igualmente reducido. Los partidos políticos han tenido ante sí las listas electorales parciales desde 1978, y las listas finales desde el 4 de septiembre de 1980. Han tenido, pues, oportunidad no sólo de depurar el Registro del Cuerpo Electoral mediante el proceso de recusación provisto por los Arts. 2.022, 2.023 y 2.023A de la Ley Electoral, sino, además, de examinar las listas electorales y alertar a sus correspondientes funcionarios sobre la existencia de posibles asientos de inscripción defectuosos, con relación a los cuales dichos funcionarios podrían utilizar el día de las elecciones el proceso de recusación provisto en el Art. 5.034 de la misma ley. Finalmente, la propia sección impugnada requiere que todo elector declare bajo juramento las razones por las cuales se acoge al sistema especial de votación, así como el hecho de no haber votado en otro colegio electoral. Cualquier declaración falsa que entonces fuese prestada constituiría perjurio, lo cual sujetaría a su autor a pena de reclusión, de ser convicto por ello. Dicha pena tendría que

---

([10]) En términos matemáticos dicha cantidad podría fluctuar entre 3 y 6 asientos defectuosos. Si bien es cierto que la distribución entre los distintos colegios no tiene necesariamente que resultar proporcional, en ausencia de prueba específica en contrario, como es la situación en el presente caso, lo más razonable es así suponerlo.

ser cumplida, por virtud de la Sec. 10 de la misma ley, de forma consecutiva con cualquiera que le fuera impuesta por la comisión del delito de doble votación tipificado en el Art. 8.026 de la Ley Electoral, 16 L.P.R.A. sec. 3376.[11] Apreciadas en conjunto las circunstancias apuntadas, no nos parece que pueda afirmarse —aún aceptando que el sistema adoptado no es el más deseable— que los mecanismos de ley dispuestos para la evitación de fraude en las próximas elecciones resultan tan deficientes e ineficaces como para sostener la conclusión de que existe una probabilidad fundada de que sus resultados se vean viciados por un apreciable número de votos fraudulentamente emitidos. En consecuencia, actuó correctamente el tribunal de instancia al determinar que la Sec. 9 de la Ley Núm. 3 no vulnera la Sec. 2, Art. II de nuestra Constitución.

### III. *La igual protección de las leyes*

Según quedara anteriormente consignado, los apelantes señalan, además, como fundamento para la impugnación de la Sec. 9 de la Ley Núm. 3, que el sistema de votación en ella ordenado vulnera la cláusula de igual protección de las leyes, de la Sec. 7 de la Carta de Derechos de nuestra Constitución. Por otra parte, el Partido Independentista Puertorriqueño impugna, por el mismo fundamento, algunas de las disposiciones contenidas en el Art. 5.036 de la Ley Electoral. En el primer supuesto se alega que el sistema de votación ordenado por la Sec. 9 de la Ley Núm. 3 encierra un trato desigual impermisible para con los electores debidamente inscritos que no tienen tarjeta de identificación electoral, y en el segundo, que de sostenerse la validez del procedimiento especial dispuesto por dicha sección, el exigirle a todo funcionario de colegio el poseer y mostrar su tarjeta de identificación como requisito para votar representa un trato desi-

---

[11] Adviértase que el Art. 8.025 en su inciso (b), 16 L.P.R.A. 3375(b), pena además el *intento* de votar más de una vez.

gual igualmente impermisible para con aquellos electores que no teniéndola desean ser funcionarios. Procede considerar ambos planteamientos por separado.

—A—

■■■ La impugnación de la Sec. 9 de la Ley Núm. 3, a nuestro juicio, válidamente señala la posible existencia de un conflicto constitucional. En efecto, dentro del cuerpo general de electores debidamente inscritos para las próximas elecciones, dicha sección distingue aquellos que no poseen tarjeta de identificación electoral e impone sobre ellos el cumplimiento de ciertos requisitos que no son de aplicación a los que sí tienen dicha tarjeta para el ejercicio de su voto. Claro está, la existencia de esta clasificación no implica por sí sola que la garantía constitucional sobre la igual protección de las leyes ha sido violada. La cuestión determinante estriba, como en toda situación que plantea una posible vulneración de la cláusula de igual protección de las leyes de nuestra Constitución, en la razonabilidad de la clasificación realizada. *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 277 (1975). Resulta necesario, pues, determinar cuál es el criterio pertinente para examinar la razonabilidad de la clasificación aquí en controversia.

■■■ En el presente caso, la clasificación bajo examen no es sospechosa de su faz. No descansa en criterios constitucionalmente impermisibles. Véase *Com. Asuntos de la Mujer* v. *Srio. de Justicia*, 109 D.P.R. 715 (1980); *Zachry International* v. *Tribunal Superior*, ante. Tampoco tiene el efecto de impedir o gravar sustancialmente el ejercicio de la franquicia electoral.([12]) No tienen, pues, razón los apelantes al sostener

---

([12]) No creemos que válidamente pueda sostenerse que resulta irrazonablemente oneroso para un elector el requisito de firmar una declaración jurada estereotipada y pro forma indicando sus razones para votar sin tarjeta de identificación electoral, asegurando, además, no haber votado anteriormente. Tampoco advertimos conflicto alguno con el derecho a la

que la razonabilidad de dicha clasificación debe ser analizada a la luz del criterio del escrutinio estricto. Si bien está fuera de discusión el carácter fundamental del derecho al voto, *Ortiz Angleró* v. *Barreto Pérez*, ante; *Giménez* v. *J.E.E.*, ante; *Wesberry* v. *Sanders*, 376 U.S. 1, 17 (1964); *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964); *Harman* v. *Forssenius*, 380 U.S. 528, 537 (1965), la Sec. 9 de la Ley Núm. 3 no afecta sustancialmente tal derecho. Por consiguiente, el criterio pertinente para examinar la razonabilidad de la clasificación aquí en controversia, a nuestro juicio, es el llamado análisis tradicional. Su utilización en casos eleccionarios, si bien no es frecuente dada la importancia de los altos valores envueltos, está sólidamente establecida. Véanse *McDonald* v. *Board of Election Comm'rs*, 394 U.S. 802 (1968); *Jenness* v. *Fortson*, 403 U.S. 431 (1971); *Rosario* v. *Rockefeller*, 410 U.S. 752 (1973); *O'Brien* v. *Skinner*, 414 U.S. 524 (1974); *Socialist Workers Party* v. *March Fong Eu*, 591 F.2d 1252 (9th Cir. 1978), *certiorari* denegado, 441 U.S. 946 (1979). *Cf. Bullock* v. *Carter*, 405 U.S. 134, 142–144 (1971); *Dunn* v. *Blumstein*, 405 U.S. 330, 335 (1971). La clasificación, por tanto, no debe ser invalidada "a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado". *Zachry International* v. *Tribunal Superior*, ante, pág. 277.

La Sec. 9 de la Ley Núm. 3 obedece al propósito primordial de hacerle posible al mayor número de electores debidamente inscritos el que efectivamente hagan uso de su derecho al voto, al mismo tiempo que provee mecanismos para asegurar la integridad del proceso electoral. Ambos propósitos constituyen, sin duda, intereses legítimos del Estado. Por otro lado, el hecho de tener o no tener disponible un elector al momento de votar su correspondiente tarjeta elec-

secretividad del voto, situación que sólo podría surgir, por excepción, de negarse el elector a prestar dicha declaración.

toral, sirve como criterio objetivo para identificar a los votantes que necesitan acogerse a un sistema especial de votación, y con respecto a los cuales, al mismo tiempo, deben tomarse medidas razonables para evitar el fraude mediante la doble votación. Existe claramente, pues, un nexo racional entre la clasificación realizada y los intereses legítimos del Estado anteriormente apuntados. El planteamiento de los apelantes por consiguiente, carece de méritos y debe ser rechazado.

—*B*—

◼ Tornando finalmente a la impugnación de las disposiciones contenidas en el Art. 5.036 de la Ley Electoral, en cuanto requieren la tenencia y presentación por parte de los funcionarios electorales de sus tarjetas de identificación electoral como requisito para votar en los próximos comicios, somos de opinión que puede ser resuelta aun sin llegar a la consideración de la cuestión constitucional planteada.

◼ La Ley Electoral, aunque de evidente naturaleza especial, constituye la legislación básica, de carácter y aplicación general en todo lo concerniente a los procesos electorales. La Sec. 9 de la Ley Núm. 3, por su parte, tuvo como expreso propósito, según se desprende de su título, el "establecer normas especiales y flexibles de votación para la elección general" a celebrarse el próximo 4 de noviembre. A nuestro juicio, las disposiciones impugnadas del Art. 5.036 de la Ley Electoral resultan sencillamente inaplicables a los funcionarios de colegio que para la fecha de las elecciones, siendo electores debidamente inscritos, no posean aún su correspondiente tarjeta de identificación electoral. No puede sostenerse que por virtud de lo dispuesto en la Ley Electoral no pueden emitir su voto, por cuanto el procedimiento dispuesto en la Sec. 9 de la Ley Núm. 3 tiene el propósito de permitir que vote en las próximas elecciones *"todo elector* debidamente inscrito aun cuando no presente su tarjeta de iden-

tificación electoral". (Énfasis suplido.) Para todo efecto práctico, por tanto, no se trata sino de un irreconciliable conflicto entre las disposiciones de una ley especial —la Ley Núm. 3— y una de carácter general —la Ley Electoral. En tal situación, las disposiciones de la ley especial deben prevalecer. *Rivera de Vincenti* v. *Colón*, 103 D.P.R. 560, 561 (1975). Cualquier otra interpretación de los textos estatutarios haría surgir, innecesariamente, un serio conflicto constitucional. *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 595–596 (1958).

## IV. *Consideraciones finales*

Como cuestión de rigor debe quedar clara constancia, en adición a todo lo anteriormente expuesto, de que la impugnación constitucional ha llegado ante nosotros a tan corto plazo de la fecha fijada para las próximas elecciones, que tanto la campaña política como los procesos preparatorios electorales se encuentran ya sumamente adelantados. La intervención judicial en el curso normal de acontecimientos de tanta trascendencia y profunda significación social, a juicio nuestro, no puede ser obtenida a fecha tan cercana a su culminación, sino solo como urgente y extraordinario remedio ante una clara y opresiva violación constitucional. En el presente caso no se ha demostrado que sea esa la situación. [13]

Reconocemos que los apelantes iniciaron y tramitaron sus causas con la mayor premura que le permitieron las circunstancias. Lo cierto es, sin embargo, que la controversia por

---

[13] En la jurisdicción federal, a manera de analogía, constatadas violaciones al derecho al voto igual como resultado de la inadecuada distribución representativa pueden quedar, en ocasiones, sin remedio inmediato, precisamente por encontrarse a fecha muy cercana la celebración de eventos electorales. La consiguiente e inevitable dilución de los votos de algunos electores en dichos comicios no ha sido razón suficiente para justificar la dilaceración de procesos eleccionarios ya en movimiento. Véanse *Reynolds* v. *Sims*, 377 U.S. 533, 585–587 (1964); *WMCA, Inc.* v. *Lomenzo*, 377 U.S. 633, 654–655 (1964); *Roman* v. *Sincock*, 377 U.S. 695, 709–712 (1964); *Lucas* v. *Colorado Gen. Assembly*, 377 U.S. 713, 738–739 (1964). Compárense, *Maryland Committee* v. *Tawes*, 377 U.S. 656, 675–676 (1964); *Davis* v. *Mann*, 377 U.S. 678, 692–693 (1964).

ellos planteada resulta, en estos momentos, de inmanejable solución judicial. Girando toda ella en torno a una legislación —por sus propios términos— de limitada aplicación, legislación aprobada, además, con carácter de urgencia para hacer frente a una grave situación con ella argüiblemente remediada, no advertimos razón alguna que justifique detener a estas alturas el proceso eleccionario, advertidas las profundas consecuencias que tanto en el plano constitucional como en el social inevitablemente arrastraría tal actuación. *La sentencia del tribunal de instancia, por tanto, debe permanecer inalterada, excepción hecha, claro está, de lo anteriormente expuesto en relación con el Art. 5.036 de la Ley Electoral.*

Se dictará sentencia de conformidad.

El Juez Presidente Señor Trías Monge emitió opinión disidente a la que se unió el Juez Asociado Señor Rigau. El Juez Asociado Señor Negrón García emitió opinión concurrente y disidente. El Juez Asociado Señor Martín se inhibió. Los demás Jueces se reservan el derecho a expresarse.

—O—

Opinión disidente del Juez Presidente Señor Trías Monge, a la que se une el Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 17 de octubre de 1980

Los casos de autos requieren que expongamos el significado y alcance de las disposiciones de la Constitución de Puerto Rico encaminadas a garantizar la pureza del proceso eleccionario en Puerto Rico. La integridad y valía del derecho al voto, base de la democracia, ocupan el centro de esta controversia.

Bajo mandato de ley no podemos negarnos a resolver las cuestiones planteadas, mas nos preocupa la inhabilidad creciente de nuestras instituciones para zanjar estas disputas de alto voltaje emocional fuera de los tribunales. A los tribunales no les es dado rehuir sus responsabilidades en estas causas

de delicadeza extrema, pero el país debe evitar en lo posible exponer su judicatura a los azares de la contienda politicopartidista. La judicatura es el freno de otros poderes, el escudo de los oprimidos, los heterodoxos y los disidentes. Cuando se ataca a la magistratura desde barricadas partidistas, se ataca el corazón mismo del sistema que garantiza la supremacía de la ley y del estado de derecho. En consecuencia, es con pesadumbre que procedemos al cumplimiento de nuestra obligación en estos casos.

Lo que se plantea aquí es la validez, dentro de las circunstancias actuales, del método especial de votación prescrito hace poco más de un mes por la Ley Núm. 3 de 8 de setiembre de 1980. (1) Este estatuto enmienda sustancialmente el pro-

---

(1) Véase particularmente la Sec. 9 de esta ley, la cual provee:

Sección 9. "Procedimiento especial de votación para la elección general del 4 de noviembre de 1980.

"Siguiendo el procedimiento que a continuación se expresa, tendrá derecho a votar en la elección general que se celebrará el 4 de noviembre de 1980 todo elector debidamente inscrito aun cuando no presente su tarjeta de identificación electoral.

"(a) Todo elector debidamente inscrito que al momento de votar no pueda presentar su tarjeta de identificación electoral deberá firmar bajo juramento una declaración jurada en la que se hará constar su nombre y apellidos, que es el elector que aparece inscrito, con indicación de la página y línea en la que aparece su nombre en la lista correspondiente al colegio en el cual ejerce su derecho al voto y las razones por las cuales necesita y desea votar sin tarjeta de identificación electoral y declarando que no ha votado en otro colegio electoral en esas elecciones. Si el elector no supiere firmar o no pudiere hacerlo por razón de algún impedimento físico, éste o la persona que lo haga a su ruego, marcará el formulario haciendo constar su nombre en letra de molde y su número de identificación electoral antes de firmar como testigo de la marca.

"La Comisión Estatal de Elecciones diseñará e imprimirá un formulario a estos efectos. El Administrador General de Elecciones enviará los referidos formularios a cada colegio electoral como parte del material electoral, conforme lo dispuesto en los Artículos 5.026 y 5.027 de la 'Ley Electoral de Puerto Rico'.

"El juramento requerido deberá ser prestado ante la Junta de Colegio Electoral y los inspectores de ese colegio firmarán el formulario. Los inspectores de colegio quedan por la presente facultados para tomar dicho juramento.

"Si el elector se negare a prestar el juramento, el Director del Colegio de Votación deberá certificar tal hecho en cada caso bajo su firma, mar-

cedimiento de votación establecido por la Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. sec. 3001 y ss.). Esta última ley intentó reimplantar en Puerto Rico el sistema de votación en colegio abierto. 16 L.P.R.A. sec. 3229. Todo elector debería solicitar y obtener una tarjeta de identificación, con su fotografía y ciertos datos incluidos en ella, como condición para el ejercicio de su derecho al voto. 16 L.P.R.A. secs. 3059 y 3229. Los colegios permanecerían abiertos entre las 9:00 a.m. y las 3:00 p.m. del día de la elección. 16 L.P.R.A. secs. 3229 y 3237.

En los dos años y más de nueve meses siguientes a la Ley Electoral de Puerto Rico de 1977 no fue posible completar el establecimiento del sistema de colegio abierto. El Registro Electoral consta actualmente de 2,070,049 electores. De éstos, se han retratado tan solo 1,518,313, lo que arroja un saldo de 551,736 electores sin retratar. Para el 22 de agosto de 1980, además, no se habían entregado 336,133 tarjetas de identificación ni quedaba tiempo para fotografiar y dotar de tarjetas a las 31,069 personas inscritas el 14 de setiembre de 1980.

Ante estas serias dificultades en la implantación del colegio abierto, la Comisión Estatal de Elecciones solicitó el asesoramiento de cuatro ex-magistrados de este Tribunal, los

cando la papeleta al dorso con la palabra 'Recusada', seguida de una breve anotación, también firmada por él, exponiendo el fundamento de la recusación, el nombre del elector, su número de identificación electoral, el municipio o precinto y el número del Colegio de Votación, y dichos votos no se adjudicarán en el escrutinio del Colegio.

"Todo elector que firme bajo juramento la declaración antes mencionada a sabiendas de que lo declarado es falso, incurrirá en el delito de perjurio y convicto que fuere, será sancionado con pena de reclusión por un término mínimo de un año y máximo de diez años.

"(b) Los colegios electorales estarán abiertos para recibir a los electores a los efectos de votar, desde las nueve (9:00) de la mañana hasta las tres (3:00) de la tarde del día de votación. Ninguna persona podrá entrar al colegio después de las tres (3:00) de la tarde.

"Todo elector cuyo nombre hubiere sido incluido en la lista general de votantes y tuviere su tarjeta de identificación electoral, podrá votar en colegio abierto en cualquier momento desde las nueve (9:00) de la mañana hasta las (3:00) de la tarde del día de votación."

señores Jorge Luis Córdova Díaz, Héctor Martínez Muñoz, Lino J. Saldaña y Raúl Serrano Geyls, sobre los problemas constitucionales que presentaba la situación y las alternativas disponibles. Los señores ex-jueces llegaron a las conclusiones siguientes:

1) Nos parece indispensable cambiar el sistema vigente de votación en colegios abiertos mediante tarjeta de identificación electoral . . . .

2) El sistema de votación que combina el colegio abierto con el colegio cerrado (abierto por la mañana para los electores que tengan tarjeta de identificación electoral y cerrado por la tarde para los que no la tengan) no contiene a nuestro juicio garantías adecuadas contra el fraude . . . .

3) En las circunstancias actuales el sistema de votación en colegios cerrados es el único que resulta compatible con la garantía constitucional del voto igual. No obstante, es imposible usar en las próximas elecciones el sistema tradicional de una sola votación en colegios cerrados. No existen hoy día, según nos informa la Comisión Electoral, locales y otras facilidades electorales suficientes para usar ese sistema tradicional de votación en las elecciones del 4 de noviembre. Por tanto, para obviar ese obstáculo, creemos que se justifica usar en las próximas elecciones el sistema de votación en colegios cerrados, clasificando a los electores por sexo, en forma tal que todos los electores del sexo femenino voten por la mañana y todos los electores del sexo masculino voten por la tarde. La clasificación por sexo que dicho sistema de votación establecería no viola la igual protección de las leyes. Tampoco está prohibida por otras disposiciones de nuestras Constitución.

La opinión de los ex-jueces se rindió el 13 de agosto de 1980. Para esa fecha ya se había presentado el proyecto de ley que habría de convertirse en la Ley Núm. 3 de 8 de setiembre de 1980, antes citada, la cual ordena el sistema de colegio combinado que aquí se impugna. Tal proyecto fue objeto de análisis por los referidos juristas y fue rechazado en la segunda conclusión que acabamos de transcribir.

La Comisión Estatal de Elecciones desatendió las recomendaciones de los juristas escogidos por ella. Los tres Comisionados que representan a los partidos de minoría votaron a favor del informe de los ex-magistrados, pero el Comisionado designado a petición del partido de la mayoría votó en contra. En tales circunstancias, la Ley Electoral dispone que lo que resuelva el Administrador General de Elecciones, nombrado por el Gobernador con el consejo y consentimiento de una mayoría de los miembros que componen cada cámara de la Asamblea Legislativa, constituirá, aunque esté en minoría, el acuerdo de la Comisión. 16 L.P.R.A. sec. 3014 (e). El Administrador General de Elecciones, señor Gerineldo Barreto Pérez, votó en contra de la mayoría de la Comisión, en contra de la opinión de los ex-jueces y a favor del punto de vista expresado por el representante del Partido Nuevo Progresista.

Con la oposición nuevamente de los tres representantes de los partidos minoritarios, el Comisionado restante y el señor Barreto Pérez decidieron entonces efectuar otra consulta, esta vez a la Junta Revisora Electoral. La Junta, nombrada en igual forma que el Administrador, opinó el 22 de agosto, contrario a los ex-jueces, que el proyecto de ley que creaba el colegio combinado "establece un sistema de votación válido que evita el fraude electoral y establece las garantías adecuadas para el ejercicio de la franquicia electoral".

El 8 de setiembre de 1980, con el voto en contra de la minoría, se aprobó la ley que requiere la utilización del colegio combinado en las próximas elecciones. Los pleitos que nos ocupan se instaron de inmediato.

La cuestión central que estos casos plantean es si la Ley Núm. 3 de 8 de setiembre de 1980 cumple cabalmente el mandato que imponen la Sec. 2 del Art. II y otras disposiciones de la Constitución del Estado Libre Asociado sobre el grado de garantía que debe ofrecerse al país para asegurarle y mantener su fe en la pureza del proceso electoral. El verdadero significado de estas disposiciones, la determinación del

criterio que establecen para medir la cantidad de fraude electoral tolerable en esta sociedad, si alguna, o de dudas sobre la limpieza de los procedimientos electorales, son interrogantes que pueden examinarse únicamente en el contexto histórico que las produce. Es ineludible, en consecuencia, que analicemos las circunstancias que provocaron la aprobación de las disposiciones constitucionales, a cuya luz hay que enjuiciar la Ley Núm. 3 de 8 de setiembre de 1980. Antes de proceder a este análisis, exploremos, no obstante, varias cuestiones preliminares planteadas.

1. *El carácter justiciable de la controversia.*

Las cuestiones que plantean estos casos son de naturaleza claramente justiciable. *Santa Aponte* v. *Secretario del Senado*, 105 D.P.R. 750, 759–762 (1977); *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84 (1980). Lo que se requiere de este Tribunal en el caso de autos es resolver si la Ley Núm. 3 de 8 de setiembre de 1980 cumple o no, en su aplicación al momento actual, con el mandato de la Sec. 2 del Art. II y otras disposiciones en la Constitución del Estado Libre Asociado de Puerto Rico. Tal función es eminentemente judicial. *Santa Aponte*, supra, 759. Según se expresa en *Baker* v. *Carr*, 369 U.S. 186, 209 (1962):

. . . [E]l mero hecho de que el pleito busca la protección de un derecho político no quiere decir que el mismo presenta una cuestión política.

Véase: Comment, *State Candidacy: Requirements, Rights and Remedies*, 116 U. Pa. L. Rev. 347, 350 (1967), *inter alia.*

2. *La facultad para entender en alegadas violaciones al proceso electoral antes de efectuarse una elección.*

La Sec. 2 del Art. II de la Constitución del Estado Libre Asociado, al requerir que las leyes garanticen la pureza del proceso electoral, no condiciona este mandato a que se pueda constatar su cumplimiento tan solo después de las elecciones.

El historial de esta sección, del preámbulo, de la Sec. 1 del Art. I y de la Sec. 1 del Art. II no sostienen interpretación tan peregrina. Recuérdese también que para la época en que se redacta la Constitución del Estado Libre Asociado existía jurisprudencia de este Tribunal que permitía su intervención para impedir que una ley de la Asamblea Legislativa anulase el derecho al voto de determinados electores. *Martínez Nadal* v. *Saldaña*, 33 D.P.R. 721 (1924).

La jurisprudencia y la doctrina sobre este particular en Estados Unidos, aunque tan solo de naturaleza persuasiva, establecen con entera claridad el derecho a impugnar las leyes electorales antes de las elecciones, inscripciones o primarias. K. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections*, 49 N.Y.U.L. Rev. 1092, 1097 *et seq.* (1974); Comment, *State Candidacy: Requirements, Rights and Remedies*, supra, pág. 352 *et seq.; Gray* v. *Sanders*, 372 U.S. 368 (1962); *Reynolds* v. *Sims*, 377 U.S. 533 (1964); *Louisiana* v. *United States*, 380 U.S. 145 (1965); *Ely* v. *Klahr*, 403 U.S. 108 (1971); *Ellis* v. *Mayor and City Council of Baltimore*, 352 F.2d 123 (4th Cir. 1965); *Hamer* v. *Campbell*, 358 F.2d 215 (5th Cir. 1966); *Michaelson ex rel. Lewis* v. *Booth*, 437 F.Supp. 439 (D.R.I. 1977), *inter alia.* Del historial de las disposiciones constitucionales que a continuación relatamos se desprende igualmente la facultad para entender en alegadas violaciones al proceso electoral antes de efectuarse una elección.

3. *El trasfondo histórico.*

La experiencia del pueblo de Puerto Rico en el ejercicio de la franquicia electoral ha sido corta y mayormente aciaga. Desde 1493 hasta la convocatoria a Cortes de 1810 no se celebraron elecciones en el país, ([2]) excepto las convocadas esporádicamente para la selección, con grandes cortapisas, de los regidores y alcaldes ordinarios. Las primeras elecciones

---

([2]) Respecto al proceso electoral de los años 1809 a 1976, véase: F. Bayrón, *Elecciones y Partidos Políticos de Puerto Rico*, Mayagüez, P.R., Ed. Isla, 1977.

por voto directo tuvieron lugar el 30 de mayo de 1869. El primer partido político no se constituyó formalmente hasta un año más tarde. F. M. Quiñones, *Historia de los Partidos Reformista y Conservador*, Madrid, Imp. de J. F. Morete, 1889, *passim*. J. M. de Labra, *América y las Constituciones Españolas de 1812*, Madrid, Tip. Sindicato de Publicidad, 1914.

La votación de 1810 y las que ocurrieron bajo la Constitución de Cádiz de 1812 fueron de tipo indirecto, de tres grados. Para su descripción, véase: L. Cruz Monclova, *Historia de Puerto Rico*, Río Piedras, Ed. Universitaria, 1958, T. I, pág. 31, y los capítulos primero a quinto del título tercero, y el primero y segundo del título sexto de la Constitución gaditana. E. Tierno Galván, *Leyes Políticas Españolas Fundamentales (1808–1936)*, Madrid, Ed. Tecnos, 1968, pág. 26 y ss. La picaresca electoral, según la frase de Sánchez Agesta, tanto en la forma de fraude privado como de actuación por parte del gobierno, le restó seriedad al proceso eleccionario de esa época. L. Sánchez Agesta, *Historia del Constitucionalismo Español*, 2da ed., Madrid, Instituto de Estudios Políticos, 1964, págs. 163–173, 443–447.

Nuestros primeros partidos políticos nacieron también en momento de gran corrupción electoral. Sobre el período constitucional septembrino ha escrito Carro Martínez:

El régimen representativo andaba a la deriva; la indiferencia política que en el pueblo español creaban las irregularidades electorales le mantenía apartado de las urnas. Los sufragios eran unas veces, las más, un mandato de los Gobernadores civiles, de los Comités y de los caciques de los pueblos.

A. Carro Martínez, *La Constitución Española de 1869*, Madrid, Ed. Cultura Hispánica, 1952, pág. 29. Carro Martínez hace, más adelante, *op. cit.*, pág. 110, comentarios que aplicaban tanto a la España como al Puerto Rico de la época:

Tanto los gobernadores como los gobernados faltaban a sus deberes. Las faltas de autoridad hacían nacer sufragios inexisten-

tes en favor del Gobierno; las faltas del pueblo incrementaban por lo general los votos republicanos. La cosa se explica con facilidad; da la casualidad que en las provincias donde el Gobernador Civil era progresista, las elecciones eran de color progresista; donde el Gobernador era unionista, triunfaban los unionistas, y casi siempre resultó que las elecciones eran el vivo retrato de las ideas del Gobernador.

La participación puertorriqueña en las elecciones era escasa. De una población de 650,000 habitantes participaron 4,000 electores en los comicios de 1869, número que se elevó en 1871 a 15,851. L. Cruz Monclova, *op. cit.*, T. II, 1ra parte, págs. 19, 167. En 1876, no obstante, en los tiempos aún más dificultosos de la Restauración, la cifra descendió a 1,900. J. M. de Labra, *op. cit.*, pág. 12. Bajo la Constitución de 1876 las Cortes no eran verdaderamente representativas, ya que el gobierno influía decisivamente en su composición. Los ayuntamientos y las diputaciones provinciales eran también formas vacías, pues los gobernadores regían sus actuaciones. J. Costa y Martínez, *Crisis Política de España*, 3ra ed., Madrid, 1914, y del mismo autor, *Oligarquía y Caciquismo como la Forma Actual de Gobierno en España*, Madrid, Imp. de los Hijos de M. G. Hernández, 1902.

Las primeras elecciones locales en 1869 se celebraron conforme a las disposiciones del Real Decreto de 14 de diciembre de 1868, 100 *Colección Legislativa de España* 925, basado en el Real Decreto, luego ley, de 9 de noviembre de 1868, 100 *Colección Legislativa de España* 578, aplicable propiamente a España. Esta legislación imponía el uso del sistema de colegio abierto, entre 9:00 a.m. y 3:00 p.m. El Real Decreto de 1 de abril de 1871, 106 *Colección Legislativa de España* 633, dispuso para la celebración en Puerto Rico de las elecciones del 20 de junio y días siguientes de 1871. Éstas debían verificarse de acuerdo con la referida ley de 14 de diciembre de 1868, por lo que también se utilizó el colegio abierto.

Nuestros primeros partidos vivieron una vida azarosa. Hubo persecución sistemática de los partidos liberales, con el

consiguiente efecto deplorable en el clima electoral. El Partido Liberal Reformista dejó prácticamente de existir en los años de 1874 a 1881. Intentó rehabilitarse en 1883, pero pronto expiró. J. de Celis Aguilera, *Mi Grano de Arena*, San Juan, Imp. de Acosta, 1886, págs. III, 97 y ss.; J. G. Gómez y A. Sendras y Burín, *Isla de Puerto Rico*, Madrid, Imp. de Gil y Navarro, 1891, págs. 75, 136; J. A. Gautier Dapena, *Trayectoria del Pensamiento Liberal Puertorriqueño en el Siglo XIX*, San Juan, Instituto de Cultura Puertorriqueña, 1963, pág. 91.

Su sucesor, el Partido Autonomista, organizado en 1887, fue combatido desde el comienzo. J. M. de Labra, *La Cuestión Colonial*, Madrid, Tip. de Gregorio Estrada, 1898, pág. 29; P. Barbosa del Rosario, *La Comisión Autonomista de 1896*, San Juan, Imp. Venezuela, 1957, págs. 73, 111, 128; L. Cruz Monclova, *Historia de Puerto Rico*, Río Piedras, Ed. Universitaria, 1962, T. III, 2da parte, pág. 264. A partir del triunfo del Partido Autonomista, capitaneado por Baldorioty de Castro, en las elecciones de marzo de 1887, se desató la era temible de los compontes. A. S. de Pedreira, *El Año Terrible del 87*, San Juan, Biblioteca de Autores Puertorriqueños, 1948. El partido acudió usualmente a la abstención electoral a partir de 1891. P. Barbosa del Rosario, *De Baldorioty a Barbosa*, San Juan, Imp. Venezuela, 1957, pág. 245 *et seq.*

Al finalizar el período de gobierno español, en Puerto Rico continuaba el sistema de colegio abierto. Véanse el Real Decreto de 31 de diciembre de 1896 y el de 25 de noviembre de 1897, el último de los cuales adaptó a Cuba y Puerto Rico la Ley Electoral Española de 26 de junio de 1890. 3 *Laws, Ordinances, Decrees and Military Orders*, Washington, Government Printing Office, 1909, pág. 1795 y ss. Esta legislación incluía fuertes penalidades y otras supuestas garantías contra el fraude electoral. Aun así continuó la inconformidad general con las prácticas electorales. L. Cruz Monclova, *Luis*

*Muñoz Rivera*, San Juan, Instituto de Cultura Puertorriqueña, 1959, pág. 638 y ss.

Durante el período de gobernación militar se celebraron las llamadas elecciones de los cien días. Preocupado por los hábitos electorales prevalecientes, el General George W. Davis eliminó el sufragio universal varonil vigente y permitió que votasen tan solo los contribuyentes de récord o los que supiesen leer y escribir, si hubiesen residido en Puerto Rico los dos años precedentes a su inscripción. O.G. 145 de 21 de septiembre de 1899. Aun así la campaña fue violenta. Luis Muñoz Rivera describió estas elecciones como las más difíciles, "cien batallas campales" de salvajes tumultos y choques cruentos. *Obras Completas de Luis Muñoz Rivera (1890–1900)*, Madrid, Ed. Puerto Rico, 1925, pág. 256.

Ante esta situación tampoco se consagró directamente el sufragio universal varonil en la Ley Foraker. El Secretario de la Guerra, Elihu Root, entre otros, se oponía a su concesión. L. J. Gould, *La Ley Foraker: Raíces de la Política Colonial de Estados Unidos*, Río Piedras, Ed. U.P.R., 1969, pág. 72. El Art. 29 de la Ley Foraker, 31 Stat. 82 (1900), mantuvo en vigor las leyes españolas y las órdenes militares existentes, sujeto a las condiciones que fijase el Consejo Ejecutivo para las primeras elecciones y a las que estableciese para el futuro la Asamblea Legislativa.

El 1 de marzo de 1902 se aprobó una Ley Electoral que continuó el colegio abierto en Puerto Rico. *Estatutos Revisados de 1902*, págs. 115, 123. Ningún esfuerzo legislativo para lograr elecciones pacíficas, limpias y libres tenía éxito. El doctor Fernós Isern escribió lo siguiente sobre esta primera época:

La Isla llegó a estar al borde de la guerra civil. En San Juan, el periódico *Diario de Puerto Rico* de Muñoz Rivera fue asaltado y su planta destruida. En San Lorenzo se libró un combate a la entrada del pueblo cuando la Policía trabó lucha con un grupo de campesinos que acompañaban un entierro, se alegó que venían a atacar la población. Los campesinos eran Federales. En Yabu-

coa, en Cayey, ocurrieron balaceras frecuentes. Se hacían arrestos viciosos para humillar personas honorables. Se llamó a esta época de "las turbas". A. Fernós Isern, *Estado Libre Asociado, Puerto Rico*, Ed. U.P.R., 1974, pág. 15.

Las turbas golpearon a los seguidores del partido minoritario de entonces y destruyeron la imprenta del periódico de don Luis Muñoz Rivera. Como resultado, se procesó al propio Muñoz Rivera por el delito, según denunció él, "de defender su domicilio". L. Muñoz Rivera, *Campañas Políticas*, Madrid, Ed. Puerto Rico, 1925, Vol. II de las Obras Completas, pág. 10.

Varios gobernadores, entre ellos Hunt en 1904, Winthrop en 1905 y 1906, Post en 1908, Colton en 1911 y Yager en 1915 y 1916, criticaron acerbamente el sistema electoral del país y recomendaron su reforma. N. Rigual, *Reseña de los Mensajes de los Gobernadores de Puerto Rico (1900–1930)*, 1966, págs. 39, 48, 61, 73, 137, 144–45.

En 1906 se aprobó una nueva Ley Electoral, *Leyes de P.R.*, 1906, pág. 33 y ss., y otra en 1919, Ley Núm. 79 de 25 de junio de 1919, sin que estas leyes y sus enmiendas hiciesen mella significativa en las prácticas censuradas. Sobre las elecciones de 1924 ha escrito Henry Wells, *La Modernización de Puerto Rico*, trad. de P. G. Salazar, Puerto Rico, Ed. Universitaria, 1972:

La elección fue, sin embargo, tan irregular que los resultados oficiales posiblemente hayan exagerado la fuerza de los vencedores. Como los unionistas y los republicanos de Tous Soto habían heredado un control completo de la maquinaria electoral, inclusive un monopolio de los oficiales de mesa y observadores, no vacilaron en cometer fraude en muchos distritos. La compra de votos y la intimidación de los electores llegó a extremos nunca vistos. Pág. 110.

Véanse también, sobre la corrupción en esta y otras elecciones hasta los años cuarenta: B. Pagán, *Historia de los Partidos Políticos Puertorriqueños*, 1959, Vol. I, págs. 244–47; G. K. Lewis, *Puerto Rico, Libertad y Poder en el Caribe*, Río Pie-

276

dras, Ed. Edil, 1969, págs. 195, 199; E. P. Hanson, *Transformation: The Story of Modern Puerto Rico*, New York, Simon and Schuster, 1955, págs. 39, 45-46, 173, 180, 185.

Para 1929 el fraude estaba tan arraigado, conforme a observadores de la época, que el sistema electoral del país continuaba en descrédito. E. Ramírez Brau, *Mancha Roja o historia breve de un elector que no se manchó*, Ponce, Ed. El Día, 1929, págs. 9, 16. En 1936 se llegó hasta el patrocinio de un concurso para premiar los mejores relatos de violaciones a la leyes electorales. D. Targa, *El Modus Operandi de las Artes Electorales en Puerto Rico*, San Juan, Imp. Puerto Rico, Inc., 1940, pág. 8 y ss. Targa describe ampliamente las técnicas de la compraventa del voto, el acorralamiento de electores para provocar su abstención, los tiroteos y otros medios prevalecientes entonces para corromper el proceso electoral. Véase también: T. Mathews, *Puerto Rican Politics and the New Deal*, Gainsville, Fla., U. of Fla. Press, 1960, págs. 263, 301-02. Las listas electorales estaban plagadas de errores. De acuerdo con un censo de la P.R.R.A., "de 852,832 personas mayores de veintiún años en la isla, 852,904 [*sic*] son votantes inscritos". El fraude más obvio fue en la municipalidad de Coamo, donde el censo encontró 9,775 habitantes mayores de veintiún años. Los electores inscritos en esta municipalidad eran la bagatela de 14,144 ó, en términos de porcentaje, 144 por ciento de los habitantes eran electores inscritos en Coamo. Mathews, *ibid.*, pág. 263. Véase, además: *Congressional Record*, Senado, Vol. 80, parte 6, págs. 5,923-5,927.

La Ley Núm. 3 de 29 de junio de 1936, que enmendó la de 1919, cambió el sistema de colegio abierto por el de colegio cerrado "para evitar el voto repetido que dio en el pasado motivo para fraude". B. Pagán, *op. cit.*, T. II, pág. 114. No fue hasta los años cuarenta que rindió fruto esta legislación después de la intensa campaña educativa librada por el par-

tido que advendría al poder a comienzos de la década. C. Ramos de Santiago, *Gobierno de Puerto Rico*, Puerto Rico, Ed. U.P.R., 1970, pág. 94 y n. 148; H. Wells, *op. cit.*, págs. 284–85. Contribuyó a este resultado la creación de un importante uso constitucional: a partir de 1940, hasta 1974, los cambios que sufrieron las legislaciones de 1919 y años subsiguientes se efectuaron tan solo con el pleno consentimiento de los partidos políticos representados en la Asamblea Legislativa. E. P. Hanson, *op. cit.*, pág. 184.

Este es el historial que tuvo ante sí la Asamblea Constituyente. La honestidad y la paz entonces reinantes estaban en su infancia. Apenas contaban doce años de edad. Tras ellas se alzaba la larga y tétrica experiencia que hemos reseñado. De este trasfondo nacen, y a su luz debemos interpretar, el Preámbulo, la Sec. 1 del Art. I y las Secs. 1 y 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico.

4. *La Asamblea Constituyente y el sufragio.*

La Sec. 2 del Art. II de la Constitución del Estado Libre Asociado, que entró en vigor el 25 de julio de 1952, dispone:

Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.

La Sec. 1 del Art. I provee, en parte:

Se constituye el Estado Libre Asociado de Puerto Rico. Su poder político emana del pueblo y se ejercerá con arreglo a su voluntad . . . . [3]

---

[3] Las otras disposiciones de la Constitución del Estado Libre Asociado relacionadas con las citadas en el texto son la declaración del Preámbulo, para reconocer que "el sistema democrático es fundamental para la vida de la comunidad puertorriqueña", habiendo de entenderse "por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público", y la proclamación de la inviolabilidad del ser humano en la Sec. 1 del Art. II.

Estas disposiciones derivan del Art. 21 de la Declaración Universal de los Derechos del Hombre, U. N. Doc. E/CN. 4/95 (1948), que afirma:

1. Toda persona tiene derecho a participar en el gobierno de su país, directamente o por medio de representantes libremente escogidos.

2. Toda persona tiene el derecho de acceso, en condiciones de igualdad, a las funciones públicas de su país.

3. La voluntad del pueblo es la base de la autoridad del poder público; esta voluntad se expresará mediante elecciones auténticas que habrán de celebrarse periódicamente, por sufragio universal e igual y por voto secreto u otro procedimiento equivalente que garantice la libertad del voto.

La segunda oración del Art. I y la Sec. 2 del Art. II de la Constitución del Estado Libre Asociado representan una unidad, dividida a todas luces en dos porciones, para fines cosméticos. Al proponerlas inicialmente, la Comisión sobre la Carta de Derechos no las separó. *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, T. 4, pág. 2563. La Asamblea Constituyente no efectuó cambios sustantivos en la propuesta de la Comisión.

El historial de la Constitución revela cuán claro estaba el recuerdo de nuestro pasado y cuán vivo era el deseo de que las leyes garanticen en todo momento la pureza del proceso electoral, para asegurar que la libre voluntad del pueblo sea la fuente del poder público. Varios delegados denunciaron en el curso de los debates los graves defectos de que solía adolecer el proceso electoral en Puerto Rico. Véanse las manifestaciones de los señores Reyes Delgado (*Diario de Sesiones de la Convención Constituyente*, T. 2, págs. 1398–99) ; Rivera Colón, *ibid.*, pág. 1409, y Barrios, *ibid.*, pág. 1428. La aportación efectuada en aquella época por el colegio cerrado fue objeto de alabanza. Véanse las manifestaciones del doctor Leopoldo Figueroa, por ejemplo. *Diario de Sesiones de la Convención Constituyente*, T. 2, pág. 1397. Los líderes del partido

más fuerte de oposición representado en la Asamblea Constituyente desearon inicialmente ir más lejos. Los señores García Méndez, Ferré, Iriarte, Figueroa, González Blanes, Llobet, Parkhurst, Soto, Géigel, Veray Jr., García Delgado, Gelpí, Colón Castaño, Alemañy Silva y Ramos de Jesús suscribieron el 31 de octubre de 1951 la Proposición Núm. 299 para que la Constitución expresase lo siguiente:

La votación electoral solo se hará en colegios cerrados o en colegios de filas cerradas en aquellos sitios donde a juicio de la Junta Insular de Elecciones no se pudiere llevar a efecto la votación por falta de local apropiado.

Los auspiciadores de esta medida aparentemente se convencieron de que su inclusión en la Constitución era innecesaria o no aconsejable, ya que no la suscitaron como enmienda a propuesta alguna en el curso de los debates. La simple presentación de la Proposición Núm. 299, no obstante, recalca el interés de sus autores en mantener la confianza en el proceso electoral lograda a través de ese método. La falta de insistencia en ella permite deducir que lo concebido como verdaderamente esencial era el aseguramiento de elecciones limpias, más que la especificación en la nueva Carta de Gobierno del método para alcanzar tal objetivo. A tal fin debe recordarse que las minorías estaban muy conscientes del uso constitucional a que nos hemos referido, sobre la manera de enmendar la legislación electoral. El señor don Celestino Iriarte se refirió expresamente en los debates a cómo fue invitado, como presidente de partido, a discutir con don Luis Muñoz Marín a mediados de los años cuarenta la redacción de una nueva ley electoral. Al no lograrse un consenso, la legislación fue aplazada. 2 *Diario de Sesiones de la Convención Constituyente*, pág. 1421.

Lo acaecido con la Proposición Núm. 326 refuerza la conclusión derivada del historial de la Proposición Núm. 299. Los señores Iriarte, Ferré, García Méndez y otros redactores

de la 299 también patrocinaron la 326. La Sec. 15 de ésta disponía:

La Asamblea Legislativa aprobará leyes no inconsistentes con esta Constitución para la reglamentación y gobierno de las elecciones . . . y garantizarán al pueblo la pureza del proceso electoral para impedir cualesquiera violaciones a su franquicia electoral.

Tampoco se insistió en esta propuesta. Es razonable suponer que las minorías en la Asamblea Constituyente, que favorecieron la Sec. 2 del Art. II de la Constitución, quedaron satisfechas de que el texto aprobado propendía adecuadamente a exigir que se garantizasen elecciones honestas y que las facultades concedidas a la Asamblea Legislativa por la Sec. 4 del Art. VI para disponer todo lo concerniente al proceso eleccionario estaban naturalmente subordinadas a los principios consagrados en la Sec. 2 del Art. II.

5. *Principios y criterios derivables de nuestra experiencia electoral pasada.*

De lo anterior se desprenden las conclusiones siguientes:

Primera, hasta pocos años antes de la Asamblea Constituyente de 1951–52, el pueblo de Puerto Rico sufrió experiencias traumáticas en su vida política. Prevalecían la corrupción electoral, la coacción, la violencia, el cinismo hacia el derecho al voto, hacia los valores de la democracia y la dignidad del ser humano.

Segunda, la Asamblea Constituyente quiso consagrar en la Constitución del Estado Libre Asociado de Puerto Rico los principios necesarios para impedir el retorno de esa pesadilla. Con tal propósito, declaró que la democracia es fundamento de nuestro sistema de vida, que el poder político emana del pueblo, que la dignidad del ser humano es inviolable y que las leyes deberán garantizar la pureza del proceso electoral.

Tercera, la Asamblea Constituyente prefirió no consignar en la Constitución el método de votación a emplearse. Dejó el asunto en manos de la Asamblea Legislativa, mas sujeto

a lo prescrito en la Sec. 1 del Art. I y las Secs. 1 y 2 del Art. II.

Cuarta, el método de votación que se decida utilizar en Puerto Rico en un momento dado no debe amenazar en modo significativo alguno la pureza electoral que hay que garantizarle al pueblo puertorriqueño o minar su fe en la limpieza de las elecciones y en la igualdad y valor del voto. La mayor parte de nuestra vida de pueblo se caracterizó precisamente por la ausencia de esa fe.

Quinta, para incurrir en violación de los principios constitucionales reseñados, no es necesario probar que el método de votación escogido provocará indefectiblemente fraude de tal proporción que el resultado de las elecciones será afectado o podrá afectarse. La Sec. 2 del Art. II es una medida cautelar. Su clara intención es preventiva. ¿Cuántas elecciones generales se han anulado en Puerto Rico en nuestra larga historia de abierta corrupción electoral? Ninguna. Difícilmente puede imputársele a la Asamblea Constituyente el propósito de restringir la invocación de la Sec. 2 del Art. II al período post-eleccionario o imponer una carga de la prueba, tan onerosa que torne en académico el precepto constitucional.

Sexta, por otro lado, tampoco podemos suponer que la intención de la Asamblea fue que una simple conjetura o especulación sobre posible daño al sistema bastase para activar la aplicación de la Sec. 2 del Art. II.

Séptima, estimamos que la clave de la Sec. 2 del Art. II y de otras disposiciones constitucionales mencionadas en el curso de esta opinión reside entre los extremos discutidos. Lo que la Constitución del Estado Libre Asociado prohíbe es que las leyes electorales den lugar, por ausencia de las garantías necesarias, al brote de temores fundados, dudas razonables o riesgo real de que la pureza del proceso eleccionario pueda afectarse sensiblemente. La Asamblea Constituyente quiso sostener y fortalecer la fe del pueblo puertorriqueño en el sistema democrático de vida, en la paz, libertad y limpieza

de las elecciones. Quiso mantener el clima de seguridad, todavía frágil, en la igualdad del voto y en el principio de que el poder político emana del pueblo. Lo que turbe perceptiblemente esa fe y ese clima, choca también con los más caros principios de la Constitución.

Antes de aprobarse la Constitución del Estado Libre Asociado, este Tribunal declaró en varias sentencias, aunque no en otras, que el derecho al voto era un mero privilegio. *Pueblo* v. *Burgos*, 30 D.P.R. 45 (1921); *Morales y Benet* v. *Junta de Inscripciones*, 33 D.P.R. 79, 93 (1924). Aun así, el Tribunal sostuvo que "una ley que obstaculice seriamente el derecho de los electores capacitados de Puerto Rico a emitir sus votos, sería anticonstitucional". *Martínez Nadal* v. *Saldaña*, 33 D.P.R. 721, 726–27 (1924). Cuatro años más tarde, en un caso del mismo nombre, 38 D.P.R. 446, 453–54 (1928), se dijo:

Cuando se redacta una constitución concediendo el derecho a ejercer la franquicia electoral, el derecho de la Legislatura queda claramente limitado por esa constitución. . . . [S]i bien la Legislatura puede reglamentar, no puede entorpecer u obstruir seriamente la franquicia electoral.

A partir de la adopción de la Constitución del Estado Libre Asociado, la índole fundamental del derecho al voto fue naturalmente reconocida. *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84 (1980).[4] En las circunstancias históricas descritas y dado el hecho de que nuestra jurisprudencia anterior a la Constitución tampoco valió para detener el fraude prevaleciente, es entendible que la Asamblea Constituyente le reconociese rango constitucional al derecho al voto e impusiese criterios severos para garantizar su valor.

6. *La aplicación de las normas constitucionales a la legislación impugnada.*

---

[4] El Tribunal Supremo de Estados Unidos ha proclamado el mismo principio respecto a la constitución norteamericana. *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964).

A la luz de las normas expuestas, examinemos las circunstancias en que se desea utilizar el colegio combinado en las próximas elecciones generales. Del historial reseñado y del estudio del récord resaltan los hechos siguientes:

1. El colegio combinado representa un sistema de votación desconocido hasta ahora en Puerto Rico. La propuesta surgió hace pocas semanas, como resultado de la imposibilidad de implantar a tiempo el sistema de colegio abierto.

2. El colegio combinado carece de las garantías que ofrecen el colegio abierto y el colegio cerrado, cuando se utiliza tan solo uno de estos dos sistemas. La tarjeta de identificación electoral, con el retrato y la firma del elector, representa la garantía máxima que brinda el colegio abierto contra el fraude. El comienzo de la votación a una misma hora en lugares no accesibles después de ese momento constituye la garantía primordial del colegio cerrado. Según determinó la ilustrada sala sentenciadora, "forzoso es concluir que el sistema de colegio combinado establecido por la Ley 3 es en teoría susceptible y vulnerable al fraude electoral, ya sea por medio del doble voto o por la suplantación de electores". [5] (Determinación de Hecho número 17, pág. 22 de la Sentencia.)

3. El posible uso del colegio combinado ha creado inquietud en sectores del país, tanto entre distinguidos estudiosos de nuestro sistema constitucional como entre todos los partidos políticos de oposición. Varios ex-jueces de este Tribunal, así como diversos profesores de derecho constitucional, en función de asesores oficiales de la Comisión Estatal de Elec-

---

[5] La aplicación de un criterio legal inadecuado para la interpretación de la Sec. 2 del Art. II de la Constitución en casos como el presente es lo que lleva al Tribunal Superior a una conclusión distinta de la que aquí se expone. Afirmó el Tribunal de instancia:

"Si bien el sistema es vulnerable o susceptible al fraude, no hay prueba alguna que nos mueva a concluir, aunque sea en base a inferencias razonables, que en las próximas elecciones habrá un fraude de tal naturaleza que pueda afectar el resultado de la elección." (Sentencia, pág. 22.) Como hemos visto, el criterio empleado por el tribunal de instancia no es el correcto.

ciones, han opinado que el colegio combinado no contiene garantías adecuadas contra el fraude. Los tres partidos de oposición en Puerto Rico, que representan entre sí el 51.72% del total de votos emitidos para el cargo de Gobernador en las últimas elecciones generales, ([6]) han impugnado ante los tribunales el uso del colegio combinado en las circunstancias presentes.

4. El método utilizado para establecer, a cortísimo plazo de las elecciones, un sistema nuevo de votación, puede indudablemente ahondar esa inquietud. En 1936, al ordenarse por primera vez el uso del colegio cerrado en Puerto Rico, se tuvo exquisito cuidado de que medida de tal trascendencia (el P. del S. 20) gozase del apoyo unánime de todos los partidos representados en la Asamblea Legislativa. *Actas del Senado*, sesión de 15 de abril de 1936, págs. 1125, 1211; *Actas de la Cámara de Representantes*, sesión de 15 de abril de 1936, págs. 1451, 1460. En el caso de la Ley Núm. 3 de 8 de setiembre de 1980 se rompió ese consenso.

5. El Registro del Cuerpo Electoral adolece de serias deficiencias. El Registro enumera en la actualidad a 2,070,049 electores. Según determinó el tribunal de instancia, "todavía hay en las listas un número considerable de posibles asientos duplicados y fallecidos". (Sentencia, pág. 18.)

6. Un número indeterminado de personas posee dos tarjetas de identificación electoral. Hay otros casos de personas que han recibido su tarjeta y se han fotografiado de nuevo.

7. Electores con derecho al voto han sido excluidos erróneamente de las listas como fallecidos o duplicados.

8. Las listas contienen nombres de personas inexistentes.

9. El supuesto incremento de un 21.8% en la población electoral de 1980 no se justifica, a tenor con el crecimiento poblacional del país.

---

([6]) *Elecciones, 1976,* Tribunal Electoral, San Juan, Coop. de Artes Gráficas R. Real, 1977, pág. 3.

10. De 1976 a 1980 fallecieron 94,773 personas mayores de dieciocho años. Esta cifra contrasta con el hecho de que solo se han excluido de las listas a 25,437 electores. (Determinación de Hecho número 13, pág. 16 de la Sentencia.)

11. Los electores que votan en colegio cerrado no tienen que presentar ninguna identificación. Su firma en la declaración jurada no puede ser confrontada con ninguna firma tomada previamente. Tampoco existe una garantía física de que no ha votado antes.

12. El problema de la identificación del elector se agrava con el alto índice de movilidad social y la manera de vivir en las ciudades, donde casi nadie se conoce. En los últimos dos años, 129,203 electores se transfirieron de un precinto a otro, lo que dificulta detectar el doble voto. (Sentencia, pág. 15.)

13. La supuesta garantía principal que suple la Sec. 9 de la Ley Núm. 3 de 8 de setiembre de 1980 para la utilización del colegio combinado es el requisito de que los electores firmen una declaración en la que hagan constar su nombre y apellidos y afirmen, so pena de perjurio, que no han votado en otro colegio electoral en las mismas elecciones. Esta "garantía" es de antiquísimo cuño. La legislación electoral de 1 de marzo de 1902 utilizaba el método de la declaración jurada como parte del proceso de recusación. *Estatutos Revisados de 1902*, Elecciones, Sec. 32, págs. 135–37. En 1906 se facultó al recusador a arrestar en el mismo colegio, después de haber votado, al supuesto infractor y conducirlo ante un juez para enjuiciamiento por perjurio. *Leyes de 1906*, págs. 52–53. En la Sec. 71 de la Ley Núm. 79 de 25 de junio de 1919, se fue aún más lejos y se requirió que el elector imprimiese la huella de los dedos pulgares de sus dos manos en el reverso de la papeleta. El recuento histórico que hemos efectuado demuestra la ineficacia de estas garantías en nuestro medio. Continuó el fraude masivo.

14. La experiencia histórica revela, además, que el enjuiciamiento de un número significativo de electores es imprac-

ticable. El Tribunal Electoral tardó, por ejemplo, dos semanas en examinar poco más de cincuenta recusaciones en el municipio de Orocovis. Sería prácticamente imposible pasar juicio sobre miles de votos recusados.

15. Los estatutos penales contra el fraude electoral han sido históricamente inefectivos en Puerto Rico como medida de prevención contra el fraude. El Código Penal de 1902 establecía cuarenta y dos delitos electorales, sin contar los establecidos por leyes especiales. Aun cuando, a diferencia del estatuto actual, se incluía en la declaración jurada el texto del delito de perjurio, no se detuvo el fraude ni se produjo el número de acusaciones esperadas. La experiencia en Estados Unidos ha sido análoga. En cuanto al fracaso del perjurio como elemento disuasivo en todo tipo de delito, véase: Note, *A Reconsideration of the Sworn Testimony Requirement: Securing Truth in the Twentieth Century*, 75 Mich. L. Rev. 1681 (1977).

Los hechos señalados proveen amplia base para concluir que en las circunstancias actuales existe un temor fundado, una duda razonable, un riesgo real de que pueda afectarse sensiblemente la pureza del proceso eleccionario en los próximos comicios. En estos momentos el colegio combinado no ofrece las garantías requeridas por nuestro ordenamiento jurídico. Declararía inconstitucional, en consecuencia, la Sec. 9 de la Ley Núm. 3 de 8 de setiembre de 1980. También declararía inconstitucional, por las razones señaladas en la opinión del Juez Asociado Señor Negrón García, la exigencia de la tarjeta de identificación electoral a los funcionarios de colegio de los partidos políticos.

A tenor con lo expuesto, revocaría la sentencia apelada y ordenaría:

1. La parte apelada se abstendrá de poner en vigor el colegio combinado, según diseñado en la Sec. 9 de la Ley Núm. 3 de 8 de setiembre de 1980.

2. Las partes someterán a este foro, dentro del plazo improrrogable de tres días, un plan detallado para la celebración de las elecciones generales el 4 de noviembre de 1980 con las garantías exigidas por la Constitución del Estado Libre Asociado, a tenor con los principios expuestos en esta opinión.

3. A fin de fortalecer la fe del país en sus procesos electorales, el plan deberá ser aceptable a todos los partidos representados en estos pleitos. De no lograrse la unanimidad requerida en esta orden, las partes deberán someter dentro del mismo plazo sus diferentes propuestas y el Tribunal proveerá.

4. El Tribunal retiene su jurisdicción para emitir las providencias que estime pertinentes para la celebración de las próximas elecciones generales conforme los criterios aquí expresados.

—O—

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 17 de octubre de 1980

En su órbita jurídico-constitucional esta excepcional apelación —impugnando la Ley Núm. 3 de 8 de septiembre de 1980, estableciendo normas especiales y flexibles de votación general para el 4 de noviembre próximo— gira en torno a la pureza comicial y carácter secreto del voto, y pone a prueba si realmente "[e]l propósito de las elecciones es obtener la expresión de la voluntad de los votantes que constituyen el cuerpo electoral de un país". ([1])

---

([1]) *La Nueva Constitución de Puerto Rico*, Puerto Rico, Ed. U.P.R., 1954, pág. 307.

La temática electoral ha sido analizada desde los siguientes ángulos: (a) relación electoral (electores y candidatos), capacidad, condiciones y otros; (b) las agrupaciones (partidos políticos, distritos); (c) procedimientos de votación y elementos del voto; y (d) cómputo de votaciones. L. Sánchez Agesta, *Principios de Teoría Política*, 5ta ed., Madrid, Ed. Nacional, 1974, págs. 283–289.

## I

En un esfuerzo legítimo por modernizar la mecánica de votación, "tendiente a agilizar el proceso", y como innovación formulada sobre la "plena confianza en la madurez política del pueblo puertorriqueño para utilizar este sistema sin que corra peligro ni la seguridad ni la pureza del procedimiento electoral", (²) la Asamblea Legislativa, en virtud de los Arts. 5.029 y 5.030 de la Ley Núm. 4 de 20 de diciembre de 1977 —denominada Ley Electoral de Puerto Rico— derogó el uso del sistema de colegio cerrado y lo sustituyó por el sistema de colegio abierto. Esencialmente dispuso que desde las 9:00 a.m. hasta las 3:00 p.m. los recintos correspondientes a los colegios electorales estuvieran abiertos para que los ciudadanos inscritos acudieran, a su mejor conveniencia y comodidad, a emitir sus votos, abandonando inmediatamente después el local del colegio.

Bajo este nuevo sistema, la salvaguarda contra la impostura se lograría estableciendo la Tarjeta de Identificación Electoral con retrato. Dicho carnet sería mostrado por el elector al ir a votar, los funcionarios del colegio corroborarían sus señas personales y, al recibir su papeleta, éste firmaría al lado de su nombre impreso en la lista del colegio. El debate parlamentario es concluyente y revelador al respecto. Para implementar, fiscalizar y garantizar el sistema de colegio abierto, contra el fraude se estimó imprescindible la referida tarjeta de identificación. (³) R. Schmidt Monge,

---

(²) Informe sobre Alcance de la Medida de la Comisión de Gobierno de la Cámara de Representantes, págs. 1, 48; *Id., Senado*, pág. 27.

(³) Un legislador expresó:

"Y las garantías concebidas son de tal naturaleza que, aparte de la integridad del pueblo puertorriqueño, de su sabiduría, de su desarrollo en la democracia, de su gran sentido de civismo, hay, por si acaso hay algún inescrupuloso que pretendiera hacer algo, violentando lo que es la Ley y lo que es la consciencia humana, *la tarjeta de identificación* con nombre, apellido, lugar de nacimiento, con nombre de padre y madre, con la firma del elector con un número, que será el número permanente del elector, y con

*Notas Sobre Derecho Electoral Puertorriqueño*, 40 Rev. Col. Abog. de P.R., Núm. 4, págs. 535, 549–550 (1979). En consecuencia, como requisito para ejercer el voto se introdujo por vez primera en Puerto Rico la tarjeta de identificación electoral con la fotografía del elector, a un costo de varios millones de dólares. Arts. 2.009, 2.010 y 2.011 (16 L.P.R.A. secs. 3059, 3060 y 3061).

Se advierte, pues, que el requisito de la tarjeta vino a ser uno adicional a los existentes. Hasta este momento, el ciudadano ejercía su derecho al voto con simplemente figurar inscrito en las listas electorales. Tratándose, pues, de una nueva formalidad impuesta por el Estado, era natural y lógico —y así la ley lo especificó— que la Comisión Estatal de Elecciones implementara la toma de fotografías y expidiera ministerialmente las tarjetas. Art. 2.009 (16 L.P.R.A. sec. 3059). En suma, desde el principio se contempló proveer gratuitamente al elector con dicha tarjeta de identificación, sin "hace[r] distinción entre los electores ya que el requisito [sería] universal para todos . . . . [E]l requisito de la Tarjeta de Identificación salvaguarda el proceso electoral de posibles fraudes", (4) circunstancia íntimamente relacionada con el hecho de que "la estructura electoral actual se ha establecido partiendo de la premisa del colegio abierto . . .". Informe de la

---

un retrato. Podría decir alguien, como yo he escuchado conceptos ignorantes confundiendo a la opinión pública, de que una persona podría inscribirse en un precinto, y además, inscribirse en otro precinto con un nombre distinto. Es posible que hubiera una persona que no guarda relación con el concepto público que hay de la integridad puertorriqueña, que haga eso; pero él podrá cambiarse el nombre y podrá cambiar circunstancias en la tarjeta, *pero no podrá cambiarse la cara*. Y hay un proceso de recusación que siempre lo han llevado a cabo los partidos políticos en todos los precintos en Puerto Rico. Eso es parte del escrutinio que hacen los buenos funcionarios electorales; y ese proceso de escrutinio no solamente se contrae a lo local, sino también en el organismo directivo del proceso electoral se revisa todo lo concerniente a la identificación de los electores. Y algunas personas piensan en si es posible que se pueda falsificar una tarjeta. Y hay garantías de firmas que se dedican a esta labor, de que no será posible."

(4) Schmidt Monge, *op. cit.*, pág. 560.

Comisión de Gobierno del Senado, 5 de septiembre de 1980, pág. 70.

El denominado "Sistema de Colegio Cerrado" advino a nuestro medio ambiente en virtud de la Ley Núm. 64 de 8 de mayo de 1936. (5) Ha sido utilizado exitosamente en todas las elecciones generales celebradas desde dicha época y el pueblo está indubitadamente familiarizado y compenetrado con el mismo. Esencialmente, tal como surge del apellido, su característica medular y diferencial del colegio abierto es que el día del evento eleccionario, a determinada hora, el local del colegio electoral cierra sus puertas y, como regla general, nadie puede penetrar en dicho recinto. Se comienza el proceso de votación y a medida que el elector vota, abandona dicho sitio. Se advierte que este método elimina de manera casi absoluta y total la posibilidad de fraude a base de que una persona, mediante impostura de otra, cometa el delito de doble voto, pues no tiene acceso a más ningún colegio o urna electoral. Únicamente ciertos electores con votos preferentes —número reducido y mediante un trámite de rigurosa identificación— pueden entrar en un recinto de colegio electoral durante las horas de votación con el exclusivo fin de votar.

Para lograr implementarlo, el sistema de colegio abierto se difundió por los medios de comunicación y se llevaron a cabo en distintos períodos actividades denominadas "rondas de fotografías", tendentes a retratar a todos los electores inscritos. Esa meta no se pudo lograr a cabalidad. De un total de 2,070,049 electores inscritos, se fotografiaron solamente 1,518,313 electores durante tres rondas. Múltiples fac-

---

(5) En la Constituyente, el Delegado Dr. L. Figueroa se expresó así: "Ahí está la Ley de Colegio Cerrado haciendo el honor a este [P]artido [Estadista Republicano] al cual yo pertenezco, asociados con el Partido Socialista; que lo hicimos en el pasado y que ha constituido un timbre, un timbre de honor, un timbre de gloria para los partidos que tuvieron la honrosa satisfacción de haber decretado esa ley". *Diario de Sesiones de la Convención Constituyente, op. cit.*, pág. 1397.

tores intervinieron. Fallas técnicas iniciales y en las proyecciones y en la planificación por la Comisión contribuyeron. La apatía y otras razones motivaron o propiciaron que un número sustancial del electorado no acudiera. A otros electores inscritos el Estado no les dio ninguna oportunidad de obtener las tarjetas de identificación. En este aspecto, notamos que la última ronda de fotografías se efectuó entre los días 3 y 28 de julio de 1980 y con posterioridad, el 14 de septiembre de 1980, se inscribieron 31,214 personas. Además, un número sustancial de los electores que se retrataron no recibieron dichas cédulas, pues no ha habido forma de entregarlas con seguridad y a tiempo. En resumen, se calcula que aproximadamente medio millón (500,000) de electores no se retrataron o, habiéndolo hecho, no tienen la tarjeta de identificación por varias razones.

Afectando sustancialmente la idoneidad del Registro del Cuerpo Electoral —cuyos datos "se mantendrán, en todo momento, actualizados en cuanto a circunstancias modificatorias de cualquier inscripción", Art. 2.012 (16 L.P.R.A. sec. 3062), y que es la base para preparar las listas de ciudadanos con derecho a votar— hay entre veinticinco mil (25,000) y cincuenta mil (50,000) asientos que corresponden a inscritos duplicados y electores fallecidos, según estimó la ilustrada sala sentenciadora.

Debido a las dificultes relacionadas con la implantación óptima de la tarjeta de identificación electoral, y ante la imposibilidad de conceder la oportunidad de suministrarla a todo ciudadano inscrito, la Asamblea Legislativa posteriormente aprobó la Ley Núm. 3, cuya constitucionalidad hoy examinamos.

Dicho estatuto, en síntesis, combina ambos sistemas de colegio —abierto y cerrado— autorizando que los ciudadanos que posean la tarjeta de identificación acudan y voten en colegio abierto entre las 9:00 a.m. y 3:00 p.m. A aquellos que carecen de dicha cédula se les autoriza a votar, previa

declaración jurada de necesidad, bajo el sistema de colegio electoral cerrado, después de las 3:00 p.m. Bajo este esquema legislativo, para el colegio cerrado se estableció —como garantía y protección contra el fraude— la declaración jurada compulsoria de necesidad.

Por su importancia, transcribimos íntegramente la disposición legal cuestionada en el presente recurso:

Sección 9. Procedimiento Especial de votación para la elección general del 4 de noviembre de 1980.

Siguiendo el procedimiento que a continuación se expresa, tendrá derecho a votar en la elección general que se celebrará el 4 de noviembre de 1980 todo elector debidamente inscrito aun cuando no presente su tarjeta de identificación electoral.

(a) Todo elector debidamente inscrito que al momento de votar no pueda presentar su tarjeta de identificación electoral *deberá firmar bajo juramento una declaración jurada en la que se hará constar su nombre y apellidos, que es el elector que aparece inscrito,* con indicación de la página y línea en la que aparece su nombre en la lista correspondiente al colegio en el cual ejerce su derecho al voto *y las razones por las cuales necesita y desea votar sin tarjeta de identificación electoral y declarando que no ha votado en otro colegio electoral en esas elecciones.* Si el elector no supiere firmar o no pudiere hacerlo por razón de algún impedimento físico, éste o la persona que lo haga a su ruego, marcará el formulario haciendo constar su nombre en letra de molde y su número de identificación electoral antes de firmar como testigo de la marca.

La Comisión Estatal de Elecciones diseñará e imprimirá un formulario a estos efectos. El Administrador General de Elecciones enviará los referidos formularios a cada colegio electoral como parte del material electoral, conforme lo dispuesto en los Artículos 5.026 y 5.027 de la "Ley Electoral de Puerto Rico".

El juramento requerido deberá ser prestado ante la Junta de Colegio Electoral y los inspectores de ese colegio firmarán el formulario. Los inspectores de colegio quedan por la presente facultados para tomar dicho juramento.

*Si el elector se negare a prestar el juramento, el Director del Colegio de Votación deberá certificar tal hecho en cada caso bajo su firma, marcando la papeleta al dorso con la palabra "Recu-*

sada", seguida de una breve anotación, también firmada por él, exponiendo el fundamento de la recusación, el nombre del elector, su número de identificación electoral, el municipio o precinto y el número del Colegio de Votación, y dichos votos no se adjudicarán en el escrutinio del Colegio.

Todo elector que firme bajo juramento la declaración antes mencionada a sabiendas de que lo declarado es falso, incurrirá en el delito de perjurio y convicto que fuere, será sancionado con pena de reclusión por un término mínimo de *un año y máximo de diez años.*

(b) Los colegios electorales estarán abiertos para recibir a los electores a los efectos de votar, desde las nueve (9:00) de la mañana hasta las tres (3:00) de la tarde del día de votación. Ninguna persona podrá entrar al colegio después de las tres (3:00) de la tarde.

Todo elector cuyo nombre hubiere sido incluido en la lista general de votantes y tuviere su tarjeta de identificación electoral, podrá votar en colegio abierto en cualquier momento desde las nueve (9:00) de la mañana hasta las (3:00) de la tarde del día de votación.

Todo elector cuyo nombre hubiere sido incluido en la lista general de votantes que no tuviere su tarjeta de identificación electoral podrá votar en su colegio después que voten todos los electores que tuvieren tarjeta electoral, una vez se haya cerrado el colegio a las tres (3:00) de la tarde.

La votación de electores continuará hasta que todos los que estén en el colegio electoral a las tres (3:00) de la tarde hayan votado. (Bastardillas nuestras.)

De su lectura resaltan varias observaciones de importancia: (1) se establece una diferencia entre *todos los electores inscritos*, a base del criterio de poseer o no la tarjeta de identificación; (2) con miras a esa disimilitud, se fundamenta y conceptualiza el colegio abierto y cerrado: (3) se especifica que el elector que *no* tiene dicha tarjeta —por cualesquiera razones antes mencionadas, incluso su propia apatía o el no haber tenido la oportunidad de retratarse por falta de trámite gubernamental, o por no habérsela suministrado la Comisión— para poder ejercer el derecho al voto

viene *obligado* —"deberá" dice la ley— a prestar una declaración jurada consignando las razones "por las cuales necesita y desea votar sin tarjeta de identificación electoral y declarando que no ha votado en otro colegio electoral en esas elecciones"; (4) si dicho elector se niega a suscribir tal juramento, automáticamente acontecen las siguientes consecuencias: (a) se certificará tal hecho; (b) se marcará y recusará la papelèta; (c) se anotará el fundamento de la recusación; (d) se apuntará el nombre y otra información electoral del votante; y (e) dicho voto no se adjudicará en el escrutinio de Colegio. Es de rigor resaltar que, aunque la ley no lo dice en estas palabras precisas, un efecto adicional que dicha papeleta experimenta es la suerte que acompaña a toda recusación, esto es, *el voto pierde su carácter de secreto.*

## II

En *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741, 749–750 (1976), expresamos:

El Preámbulo de nuestra Constitución, al proclamar el sistema democrático como la base fundamental para la vida y coexistencia de la comunidad puertorriqueña lo define como "aquel donde la voluntad del pueblo es la fuente del poder público, donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas". La Carta de Derechos en sus Secs. 2, 4 y 6, respectivamente establece que dicha voluntad se exprese mediante el sufragio universal, igual, directo, secreto y libre de coacción, para lo cual la existencia de la libertad de palabra y asociación son esenciales. La Asamblea Legislativa, en virtud de la Sec. 4 del Art. VI, quedó *encomendada* de proveer legislación en "todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidatos". (Bastardillas nuestras.)

Una reflexión ulterior del legajo constituyente revela que más que una encomienda, el Poder Legislativo recibió un *mandato* insoslayable en la Carta de Derechos imponiéndole

la obligación de *garantizar* —palabra clave— la *pureza* del sistema electoral. Proviene de "garante", esto es, que da garantía, asegurando y protegiendo algo contra algún riesgo o necesidad. (⁶) A esos efectos, recordemos el lenguaje constitucional, único en todo este documento y exento de oscuridad: "Las leyes *garantizarán* la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral." (Énfasis nuestro.) Art. II, Sec. 2, Carta de Derechos.

Se advierte, pues, que la tutela del derecho al sufragio corresponde asegurarlo inicialmente a la Asamblea Legislativa. A la hora de promulgar una ley electoral, dicho Poder está compelido a adoptar las medidas conducentes a su plena realización y en evitación del fraude electoral. En última instancia, será función de los tribunales, en controversias apropiadas, dictaminar la juridicidad y suficiencia constitucional de tales medidas legislativas al amparo de la Ley Fundamental.

¿Qué significado y alcance tiene ese mandato? ¿Cuál es su impacto sobre la impugnación de la Ley Núm. 3? ¿Es válido un diseño legislativo que separa e impone como condición para el ejercicio del sufragio a medio millón de votantes —una cuarta parte del electorado— la suscripción de una declaración jurada de necesidad so pena de perjurio y de recusación? Las respuestas a tales interrogantes exigen una breve referencia al trasfondo doctrinario vigente.

En el pasado nos hemos hecho eco del precepto sobre garantía de sufragio universal, inyectándole virtualidad y juridicidad en un elenco de diversas situaciones. En tal sentido,

---

(⁶) En este sentido, la Constitución, en materia de legislación electoral, rechaza la improvisación, el apasionamiento, el sectarismo y todo aquello que se aleja de la serenidad, imparcialidad y eficacia. El arte de buen gobierno precisa que no se experimente con el sufragio electoral. No es cosa que se pueda ensayar sin que exponga al país a peligrosas consecuencias.

consistentemente, en materia de hermenéutica jurídico-electoral y constitucional, hemos reafirmado los siguientes postulados: (a) que en la regulación de los cauces electorales, la Asamblea Legislativa tiene constitucionalmente una amplísima facultad para reglamentar todo lo concerniente al voto, sujeto a los parámetros fijados en nuestra Ley Fundamental, *P.N.P.* v. *Tribunal Electoral*, supra, págs. 744–745; (b) "que el sistema político puertorriqueño está organizado sobre una base plenamente democrática y . . . [tiene una] íntima relación . . . con la certeza y estabilidad del proceso electoral", *García Passalacqua* v. *Tribunal Electoral*, 105 D.P.R. 49, 50 (1976); (c) que "una democracia liberal nutre su fuerza creadora y renovadora no sólo del derecho individual a diferir, sino de darle plena oportunidad al opositor para que colectivamente, a través del debate político y *las urnas*, transforme su papel de crítico y adversario al de dirigente", *Democratic Party* v. *Tribunal Electoral*, 107 D.P.R. 1, 26 (1978) (opinión concurrente y disidente) (bastardillas nuestras), (d) que nuestras leyes electorales aspiran "a perfeccionar la pureza del proceso electoral y nuestro sistema democrático de gobierno", *P.N.P.* v. *Tribunal Electoral*, supra, pág. 743; (e) que "existe un interés superior en la escala de valores constitucionales, congruente y medular a un sistema de gobierno de verdadera democracia representativa *que exige que la integridad y pureza del proceso electoral no sea conculcada por las influencias nocivas, sean en apariencia o reales*", *id.*, pág. 754 (bastardillas nuestras); y (f) que "en la constelación de derechos fundamentales, el sufragio electoral goza de preeminencia sobre inconvenientes administrativos o económicos superables". En consecuencia, "contra la observancia de los preceptos constitucionales no pueden oponerse *escollos salvables* de tipo económico o burocráticos. Es menester mover los resortes de la maquinaria electoral en la consecución de tal fin. *P.S.P.* v. *Tribunal Electoral*, 104 D.P.R. 230 (1975)".

*Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84 (1980) (opinión concurrente).

Para comprender las dimensiones funcionales del sufragio electoral, descompongamos sus elementos cuádruples:

(a) *Sufragio universal*. Constituye la espina dorsal del mecanismo público-político. El nervio que la sostiene es la igualdad de todos los seres humanos y una confianza y efectos en sus decisiones. Conlleva "un llamamiento a todos los ciudadanos, porque se cree que entonces se operará espontánea y democráticamente una selección que saque a flote a los [candidatos] más idóneos . . .". N. Pérez Serrano, *Tratado de Derecho Político*, 1976, pág. 343.

(b) *Igual*. La frase "un hombre, un voto" (*one man, one vote*) condensa adecuadamente el extenso ámbito del concepto. El valor del voto es de carácter singular, no plural. Se sitúa en un mismo nivel y equivalencia aritmética, sin que sea lícito diluirlo, fraccionarlo, multiplicarlo o ampliarlo por razones de indebida representación proporcional territorial o poblacional; doble votación o privilegios basados en posición social, económica, cultural; intereses o factores ajenos al criterio de paridad e identidad. "Aplica la idea de igualdad con toda crudeza, considerando que los votos se cuentan, no se pesan." J. Xifra Heras, *Curso de Derecho Constitucional*, 2da ed., Barcelona, Ed. Bosch, 1957, T. I, pág. 434.

(c) *Directo*. "La expresión constitucional de *voto directo* refleja el método de elección popular, mediante el cual intervienen todos los electores cualificados, contrapuesto con el método de votación indirecta a través de delegados." *García Passalacqua* v. *Tribunal Electoral*, supra, pág. 65.

(d) *Secreto*. La importancia de este elemento como integrante del sufragio no puede subestimarse. "Se admite hoy generalmente que la forma más efectiva para salvaguardar al votante de cualquier presión privada o pública radica en el voto secreto." *La Nueva Constitución de P.R.*, *op. cit.*, pág. 312. La Asamblea Constituyente fue sumamente celosa en

explicar los límites de esta condición. Dijo: "[e]s secreto para asegurar la inviolabilidad del albedrío del elector —y añadió— [e]l requisito de que el voto sea secreto no se violenta porque resulte necesario establecer alguna identificación en el caso de personas ciegas o en el de jueces de mesa u otros funcionarios electorales . . . . Los *casos de excepción* siempre presentes en situaciones universales no requieren señalamiento especial una vez se reconozca el nivel correspondiente al lenguaje constitucional". *Diario de Sesiones de la Convención Constituyente, op. cit.,* T.4, pág. 2563. (Bastardillas nuestras.)

Notamos, pues, que únicamente por excepción los autores de la Constitución concibieron y contemplaron se pudiera interferir o alterar la secretividad del voto. Por nuestra parte, nos hemos pronunciado en el sentido de que el objetivo del voto secreto de un ciudadano es asegurarle contra y protegerlo de las coacciones, para garantizarle la libertad de poder entrar a la caseta electoral, solo con su conciencia, y hacer allí su cruz, secretamente, sin que a nadie le importe cómo y dónde la hizo. *P.N.P.* v. *Tribunal Electoral,* 104 D.P.R. 741 (1976). Repetimos, es esencial que el voto sea confidencial, pues con ello "se evitan coacciones y represalias que pondrían en peligro la independencia del elector y la consiguiente sinceridad de su sufragio". Pérez Serrano, *op. cit.,* pág. 364. Sólo por *excepción,* basada en un interés apremiante y legítimo, producto de un racional balance de alternativas, resulta cognocible abrir el voto al escrutinio público.

### III

La causa mayor de patología electoral es el doble voto, tara de la que se ha librado en las últimas décadas Puerto Rico, en sus eventos electorales para puestos electivos. Podemos opinar que la pureza o pulcritud del sistema eleccionario ha sido motivo de preocupación entre todos los poderes públicos y políticos del país. El presente no es excepción.

La Ley Electoral vigente reafirma "el principio de que los propósitos de existencia de un ordenamiento electoral *descansan en unas garantías de pureza procesal capaces de contar cada voto en la forma y manera en que sea emitido*". Aspira a "garantizar la confianza del electorado puertorriqueño en unos procesos electorales *libres de fraude y violencia . . .*". Art. 1.002 (16 L.P.R.A. sec. 3002) *in fine.* (Bastardillas nuestras.)

Con ese objetivo en mente, en enmiendas posteriores, la Asamblea Legislativa reconoció la "obligación y deber de nuestro Gobierno y a su vez de la Comisión Estatal de Elecciones, el producir listas electorales eficientes y confiables de manera que se mantenga la pureza de nuestros procedimientos electorales". Informe Comisión de Gobierno, Cámara de Representantes, de 3 de mayo de 1979, sobre el P. del S. 886, convertido en la Ley Núm. 51 de 20 de mayo de 1979. Véase, además, en igual sentido, el Informe Comisión de Gobierno del Senado, de 3 de abril de 1979, que persigue "mantener las listas electorales debidamente depuradas".

En consecuencia, no aceptamos la tesis de que se esté fraguando deliberadamente un plan gubernamental organizado de fraude[7] colectivo electoral. Es con votos, no en los tribunales, mediante decisiones, que se ganan unas elecciones. Tomamos conocimiento judicial de que siempre las listas electorales, en mayor o menor grado, han contenido errores e imperfecciones del carácter apuntado en esta ponencia. El margen de error humano, con o sin la computadora electrónica, resulta imposible de eliminar. Ahora bien, en el pasado, tales deficiencias eran subsanadas a través del sistema de colegio cerrado, que garantizaba la pulcritud de las elecciones.

En nuestro ordenamiento jurídico el fraude nunca se presume. Su existencia no puede fundarse en meras conjeturas,

---

[7] *Fraude,* del latín *fraus, fraudis,* significa "engaño, inexactitud consciente, abuso de confianza, que produce o prepara un daño, generalmente material". *Diccionario de la Lengua Española,* 19ma ed., 1970, pág. 635.

sospechas o especulaciones, sino que ha de basarse en prueba robusta, clara y convincente. *Monclova* v. *Financial Credit Corp.*, 83 D.P.R. 770, 776 (1961), y casos allí citados. Y aunque la utilización *combinada* de los dos sistemas de colegio —abierto y cerrado— entraña para algunos sectores jurídicos y políticos del país, unas espectativas de grave riesgo de fraude y suscita recelos, la sola alegación no puede poner en entredicho toda la confiabilidad y limpieza del sistema electoral y los cimientos que sostienen la legitimidad de la democracia puertorriqueña. Coincidimos con el reputado tribunal sentenciador de que el sistema híbrido eleccionario "es en teoría susceptible y vulnerable al fraude electoral, ya sea por medio del doble voto o por la suplantación de electores". Recuérdese que las características sobresalientes del colegio cerrado —simultaneidad y acceso físico restringido— que evitan el doble voto por la impostura de personas fallecidas, ausentes, incapacitadas, e inscripciones duplicadas o erróneas, se pierden cuando el sistema de colegio cerrado se combina con el sistema de colegio abierto. En principio, como hipótesis correcta, nada impide que quien vota en el colegio abierto por la mañana, conocedor de las circunstancias personales de una inscripción incorrecta, previa declaración jurada en la que consignará las circunstancias espurias expuestas, vote nuevamente bajo el sistema de colegio cerrado. En este sentido, los defectos de que siempre han adolecido las listas del registro electoral han sido neutralizados mediante el uso exclusivo del colegio cerrado. Sin embargo, no habiendo los demandantes superado la alegación de fraude teórico, rechazamos el análisis que intenta así sostener una intervención del Poder Judicial pre-eleccionario. Coincidimos con el tribunal de instancia y concurrimos con la sentencia de este foro en que, por este fundamento, el dictamen es intocable. *Torres* v. *Junta Insular de Elecciones*, 40 D.P.R. 429 (1930).

## IV

Ahora bien, disentimos sobre otros extremos. El deseo reiterado e insistente de la Asamblea Legislativa en darle uso inmediato a la tarjeta de identificación electoral para la comodidad y conveniencia de aquella mayoría de electores (1,518,313) que lograron retratarse y obtenerla, [8] frente a los otros (500,000 aproximadamente), contrario a lo concluido por este tribunal y el de instancia, crea un problema real y delicado a nivel constitucional sobre igual protección de las leyes y secretividad del voto. Examinémoslo.

Al evaluar integralmente las normas electorales aplicables, notamos que se establece una clasificación sospechosa e injustificada al exigirle a un número significativo de electores —bajo coacción de perder el carácter secreto de sus votos— que expliquen compulsoriamente y bajo juramento las razones por las cuales acuden a votar *sin* la tarjeta de identificación electoral, exigencia irrazonable en vista de que el Estado fallara en entregarlas o en dar a decenas de miles de ciudadanos la oportunidad de fotografiarlos. Se ha sustituido la tarjeta electoral con la declaración jurada de necesidad como salvoconducto a las urnas. La alternativa a que se expone el elector si se niega a suscribir tal declaración es la recusación del voto, violándole así su secretividad. Se produce, pues, a nivel de toda la Isla, unas condiciones onerosas e irrazonables a medio millón (500,000) de electores —quienes *a priori*, como condición de ejercer el sufragio, y por la simple razón de no poseer la tarjeta electoral— son objeto de una sospecha legislativa y unas exigencias, al requerirles que demuestren su aptitud, idoneidad y honestidad, con el agravante de que una negativa por cualesquiera razones implica la recusación automática del voto, lográndose de ese modo hacer pública sus preferencias e ideologías políticas.

---

[8] Informe Comisión de Gobierno Cámara de Representantes, 2 de septiembre de 1980, pág. 12.

Desde esta perspectiva, el sistema de colegio electoral combinado no es permisible bajo nuestra Constitución. La "garantía" contra el fraude —en vista de las deficiencias en las listas electorales— se intenta lograr separando y clasificando, indebida e irrazonablemente, a un segmento sustancial de electores del país, entre los que se cuentan miles que no tienen responsabilidad alguna por la situación imperante. Obsérvese que esta declaración jurada exigida a una cuarta parte de la población electoral tiene distinto fundamento a la requerida para que un elector ejerza el procedimiento del voto ausente. Art. 5.038 (16 L.P.R.A. sec. 3238). Este trámite y la declaración requerida son aceptables constitucionalmente por tratarse de situaciones de verdadera excepción, basadas en otras razones y bajo el control y voluntad del elector concernido. En contraste, la obligación de firmar una declaración jurada para votar en colegio cerrado se conceptualiza a base de la clasificación de colegios. Dicha declaración jurada se hace bajo apercibimiento de perjurio y es mandatoria. Degrada el derecho constitucional al voto de cientos de miles, más allá de la marca física visible que rechazamos hace casi medio siglo como medio apropiado para evitar el fraude. *Pueblo* v. *Ramírez Brau*, 42 D.P.R. 80 (1931). En estas circunstancias, es difícil percibir que la comodidad de la mayoría sea interés apremiante gubernamental suficientemente válido para fundamentar un discrimen contra un minoría númerica de electores.

La nota típica que engloba la finalidad de toda ley electoral es el ejercicio y cómputo del voto igual, directo y secreto, esto es, uniforme, universal y sin restricciones innecesarias. La Asamblea Legislativa, sin desearlo, y teniendo ante sí otras opciones valederas, rechazó alternativas que garantizaban, teóricamente y en la práctica, de forma más satisfactoria la pulcritud del proceso electoral. Consciente de la falla en implementar universal y uniformemente la mecánica de la tarjeta de identificación electoral —y, por ende, de que

el sistema de colegio abierto no podía ponerse en práctica en su totalidad— creó una clasificación de electores, a quienes impuso, no como excepción, sino *como regla general*, unos requisitos más onerosos que a otros y que, en fin de cuentas, de no aceptarse, implica la disyuntiva de que se vulnere la secretividad del voto. Al así hacerlo, el Poder Legislativo descartó otras opciones que garantizaban a todos el ejercicio del voto, sin oprimir a ninguno. ([9])

## V

Adicionalmente, el requisito de la Ley Núm. 3 —que enmienda el Art. 5.036 a los efectos de que votarán "en forma secreta, los funcionarios asignados al colegio, *siempre* que sean electores inscritos del precinto [y] . . . *tengan consigo y presenten a los demás miembros* de la Junta de Colegio su tarjeta de identificación electoral y su nombramiento"— (bastardillas nuestras) es discriminatorio contra el Partido Independentista Puertorriqueño (P.I.P.), a la luz de la prueba no contradicha de que dicha agrupación ". . . ha conseguido 15,174 electores dispuestos a ser funcionarios de colegio, de los cuales 3,305 no poseen la tarjeta de identificación electoral y, por consiguiente, . . . no podrán trabajar como funcionarios". Exploremos la solidez de este señalamiento.

---

([9]) En este aspecto, notamos que influyó ante el tribunal sentenciador la tesis de que no había tiempo suficiente para implementar una mecánica viable para el voto "adelantado o preferente" en caso de adoptarse el sistema de colegio cerrado. Esta apreciación es incorrecta. Nada impide que se ponga en funcionamiento el sistema de voto preferente, utilizándose precisamente la tarjeta de identificación electoral. Las enfermeras, los técnicos, los médicos, los empleados gubernamentales, públicos o privados en funciones esenciales, los periodistas, las personas con limitaciones físicas y otras de circunstancias meritorias análogas —que poseen dicha tarjeta—, mediante reglamentación sencilla podrían utilizarla a los fines de ejercer el voto por adelantado. No habría reparo constitucional alguno, pues: (a) se trata de una situación de *verdadera excepción;* (b) no se propiciaría el fraude; y (c) quienes actualmente carecen de dicha tarjeta no podrían votar bajo el sistema de colegio abierto.

El Art. IX de las Disposiciones Transitorias de la Constitución, en su Sec. 6 dispone:

Los partidos políticos continuarán disfrutando de todos los derechos que les reconozca la ley electoral, siempre que reúnan los requisitos mínimos exigidos para la inscripción de nuevos partidos por la ley vigente al comenzar a regir esta Constitución. La Asamblea Legislativa, cinco años después de estar en vigor la Constitución, podrá cambiar estos requisitos, *pero cualquier ley que aumente los mismos, no será efectiva hasta después de celebrada la elección* general siguiente a la aprobación de la misma. (Bastardillas nuestras.)

Al precisar en el pasado los horizontes de este precepto, nos hemos pronunciado así:

Esta disposición trasciende su carácter temporal para dar cabida permanente al axioma rector que impregna la Carta de Derechos de la Constitución de que en una sociedad democrática todos los electores y partidos políticos "gozarán de iguales derechos". *Diario de Sesiones, op. cit.,* pág. 2067. A través de las Secs. 1 y 2 de la Carta persiste e impone a la Asamblea Legislativa unas limitaciones al ejercicio de su amplia facultad para reglamentar la formación de los partidos políticos, negándole poder para poner en vigor, durante el cuatrienio en que aprueba la pieza legislativa, cambios que aumenten los requisitos de inscripción. *Cualesquiera de tales modificaciones solo pueden tener vigencia pasadas las elecciones generales ulteriores.*

En el contexto constitucional expuesto, el principio igualitario intenta evitar que en determinada época, un partido mayoritario —que controle las Ramas Legislativas y Ejecutiva— se perpetúe en el poder limitando la génesis de otros partidos, y, *además:* (a) agrave la situación de los partidos de oposición existentes; y (b) *introduzca cambios de cualesquiera forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja del partido gubernamental y en perjuicio de los otros. Esta prohibición respecto a aumentar esos requisitos, es susceptible de manifestarse y aplicarse a toda situación que tienda a hacer onerosa y afectar negativa y sustancialmente las potencialidades de los partidos contrarios minoritarios.* En palabras

sencillas, no pueden cambiarse las reglas de juego durante su desarrollo para lograr ventajas. *P.I.P.* v. *E.L.A.*, 109 D.P.R. 403, 426–427 (1980). (Bastardillas nuestras.)

Hemos visto cómo, para los comicios electorales del año 1976, la simple inscripción era el único requisito y título definitivo para ejercitar el sufragio electoral. El cambio introducido posteriormente por la Legislatura modifica las reglas del juego, pues añade la tarjeta de identificación electoral.

A poco que reflexionemos se manifiesta otra vez, pero de distinto ángulo, la ilegalidad del sistema de colegios electorales combinados. *Primeramente*, la labor de fiscalización, tan necesaria para la pureza electoral, queda limitada y coartada por el artículo 5.036 de la ley. Obviamente, resulta un requisito irrazonable para aquellos electores miembros del P.I.P. que desean ser funcionarios de colegio y a quienes el Estado no les ha dado la oportunidad de retratarse.

En *segundo término*, no habiendo podido implementarse dicha tarjeta entre todo el electorado y optarse entonces por establecer el sistema de colegios combinados, se incurre en las clasificaciones discriminatorias de electores antes explicadas y en unas exigencias irrazonables para ejercitarse el sufragio. En la medida en que las condiciones impuestas para el voto electoral en los colegios cerrados agravan a los electores de los partidos apelantes —en particular los pertenecientes a la oposición a quienes les puede resultar más preciada la secretividad del voto— se está afectando indirecta, pero sustancialmente, el principio constitucional esbozado.

Recapitulando, la clasificación de electores, a base del sistema de colegio abierto y cerrado, es inherentemente sospechosa. La declaración jurada compulsoria, con la alternativa de recusación del voto, es una condición intolerable sobre el sufragio, que violenta su secretividad.

Tratándose de unas clasificaciones sospechosas, se impone un riguroso examen judicial. Según demostrado, el sistema vulnera las protecciones constitucionales del sufragio elec-

toral y la igual protección de las leyes a los demandantes[10]) y no puede subsistir. *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975). Eliminada del panorama la declaración jurada de necesidad, no hay garantía seria, cierta y efectiva contra el fraude. De lo contrario, ¿por qué se exige tal declaración? Vemos, pues, que lo que pertenecía al mundo de lo teórico y las ideas, se torna en una auténtica realidad. Queda comprobada entonces la fragilidad constitucional del andamiaje que sostiene el sistema de colegios combinados, el cual cae por su propio peso.

Conservando este foro judicial jurisdicción sobre el asunto, la Asamblea Legislativa y la Comisión Estatal de Elecciones, a la mayor diligencia, deberán hacer los reajustes necesarios y con prontitud adoptar los remedios correctivos.

## VI

Para ultimar, en nuestra opinión concurrente emitida en *Ortiz Angleró* v. *Barreto Pérez*, supra, pág. 101, expusimos nuestras preocupaciones en torno a la participación potencial de miembros de la judicatura en las polémicas de asuntos públicos polarizados, matizados o impregnados de contenido político-partidista, y a que algunos pronunciamientos fueran "*equivocadamente* apreciados como críticas gratuitas a las otras ramas gubernamentales, que exacerban innecesariamente las naturales zonas de fricción existentes entre los órganos constitucionales. Debemos evitar esta especulación, pues la garantía del dogma de independencia judicial se torna supérflua cuando ello ocurre". (Bastardillas nuestras.)

Allí prudencialmente "*recomendamos* total abstención en la participación de asuntos controversiales, análogos o relacionados, en menor o mayor grado, con polémicas político-

---

[10] El planteamiento de inconstitucionalidad por parte del Partido Socialista Puertorriqueño, basado en dos penas diferentes por un mismo delito —doble votación— es prematuro. Correspondería aducirse en la causa criminal correspondiente. Por ello, nos abstenemos de pasar juicio específico.

partidistas", nos abstuvimos de "pasar juicios *finales* críticos sobre instancias [de jueces] en particular" (bastardillas nuestras), y expresamente rechazamos la cualidad de infalibles en materias deontológicas. Reconocimos, además, que deliberaciones de esta naturaleza podrían ser objeto de malos entendidos o apreciarse como un intento de imponer un absoluto mutismo judicial. Aún así, los temas referentes a la ética, la imparcialidad, la neutralidad y la verdad son de tanta importancia que ameritan, en la misma tesitura de antes, unas suscintas reflexiones adicionales.

Una rápida ojeada al repertorio revela una variedad de posiciones y expresiones que, aunque procedentes de diferentes latitudes, son expositivas de una idea similar. Por vía de ilustración, una, con retórica elocución, concibe la ética como simple fenómeno psíquico espurio, cuya categoría corresponde a una asepsia gramatical de género literario. [11] Otra menoscaba la valía de la imparcialidad y neutralidad judicial, considerándola un mito producto de una candidez idealista, excusa utilitaria o instrumento de autoalabanza. [12] Y otra, de moda materialista, caracteriza tal neutralidad como ficción, estimándola reflejo exclusivo de los valores de las clases dominantes. [13]

---

[11] "Hemos padecido, con honrosas excepciones, tribunales modosos, cautelosos, temerosos, obsequiosos, delicadamente afinados a la tonada oficial, con sus giros barrocos, su complicado contrapunto. Hemos conocido también otra *peligrosa variedad de cortes* que, quizás por reacción contra las descritas, se arroparon con mantas de mecanismo estéril, *neutralidad inconscientemente ficticia, antisepsia puramente semántica* y otros ropones diseñados para apartarnos de los males que la justicia ordena combatir." Hon. Trías Monge, J., *Las Revistas Jurídicas y el Derecho Puertorriqueño*, 29 de agosto de 1980, págs. 1, 2. (Bastardillas nuestras.)

[12] "La imparcialidad es, ya la ilusión de los ingenuos, el estandarte del oportunismo o la vanagloria del deshonesto. Nadie . . . nadie tiene derecho a sentirse imparcial respecto a la verdad o la mentira." Gaetano Salverini, Prof. de Harvard, citado en una ponencia del Lcdo. Héctor Lugo Bougal titulada *La Colonia, Nuestra Justicia y el Colegio de Abogados de Puerto Rico*, 7 de septiembre de 1980, pág. 28.

[13] "No se trata de asentar el mito de la independencia olímpica. Ni es neutral el Derecho, ni, por consiguiente, en su aplicación cabe un

La dificultad de estas interpretaciones es que parten de la misma premisa incorrecta, a saber, que todos los seres humanos adolecen de la limitación de no poder juzgar a sus semejantes objetivamente, libre de trabas y con ecuanimidad, sustrayéndose de sus preferencias e intereses personales. En este sentido, tales argumentos son la antítesis de una sociedad democrática afianzada sobre el imperio del Derecho. Corresponden a un escepticismo negatorio de la legitimidad de las creencias y sentimientos deontológicos originados en la fibra del espíritu y puestos en práctica por la judicatura del país, a través de vivencias cotidianas tanto profesionales como personales.

No se puede desdeñar o negar seriamente la existencia de la ética y la moral, cuyas génesis e influencias trascienden la simple lectura de textos y aquel estado ideal metafísico de puro valor inmutable. Aunque intangible, la ética es fuerza que se percibe, detecta e intuye. En contraste con la importante función clásica del abogado de defender ante los tribunales a un litigante en particular o abogar en una causa criminal, la misión del juez de juzgar con eticidad, esto es, con imparcialidad y verdad, cobra clara dimensión y sentido moral judicial en los gnómicos versos de Machado: "[T]u verdad no, *la verdad*. Vamos a buscarla. La tuya guárdatela". ([14])

Ninguno de los enfoques que erosionan y devalúan la ética judicial tienen cabida en nuestra administración de justicia. Son foráneos, ajenos e incompatibles a la integridad y honra, tradicional y contemporánea, de la judicatura puertorriqueña. Aunque originados desde distintos foros y puntos cardinales, de prevalecer, como denominador común, tendrían la nefasta consecuencia de deformar, hacer añicos y reducir a escombros los pilares de imparcialidad e independencia del

---

ejercicio de independencia ideológica." Fernández Viagas, citado por Oscar Alzaga, *La Constitución Española de 1978*, Ed. Del Foro, 1978, pág. 715.

([14]) Alzaga, *op. cit.*, pág. 46.

Poder Judicial como valor fundamental y "factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática". Canon XIII de los de Ética Judicial.

Deferencialmente objetamos todo desmerecimiento a la verticalidad y ejecutorias de la magistratura puertorriqueña del pasado y presente. Los jueces no subsistimos en cámaras de oxígeno. "No somos autómatas del derecho, ajenos a las injusticias, el dolor o a los agravios. No vivimos en mundos distantes o apartes. Neutralidad judicial no es sinónimo de insensibilidad." *Ortiz Angleró*, supra, págs. 94–95. Nunca hemos sido espectadores pasivos de las inequidades y agravios oficiales ni sordos a los reclamos de justicia. Sencillamente respetamos un compromiso de honor contraído al prestar juramento, de autodisciplina judicial, de juzgar, combatir los males sociales y remediar las injusticias lícitamente, sólo en la esfera de nuestra propia competencia, a saber, los dictámenes y pronunciamientos adjudicativos desde el estrado de los tribunales. No consideramos permisible hacernos eco y asumir representaciones de oráculo de lenguaje esotérico y anfibológico, enjuiciando a destiempo desde otras tarimas y foros públicos las actuaciones, posturas y filosofías políticas de quienes en determinado horizonte histórico detentan los Poderes Constitucionales restantes.

No olvidemos: "No puede diversificarse la persona que a la vez es juez. El desempeño del cargo exige autolimitaciones que no se extienden a otras profesiones. *La línea entre una opinión personal y cuando actúa como órgano judicial es muy tenue. Es casi imposible, por no decir ilusorio, deslindarla. Cuando se hace pública, se quiebra y desaparece.* Así, la rúbrica judicial se proyecta en toda su extensión e intensidad en las opiniones de jueces a título personal y pueden sobrevenir malas interpretaciones y especulaciones. *Para los efectos señalados, un juez siempre es juez." Ortiz Angleró*, supra, pág. 104. (Bastardillas nuestras.)

No podemos refrendar la tesis que propugna un relati-

vismo circunstancial ético. "Al presente, para algunos, se puede dar la incorrecta impresión de que, por circunstancias propias del momento, las prohibiciones y dimensiones éticas comentadas han perdido importancia e interés. Basta señalar que, aparte de sus valores morales intrínsecos, la historia y experiencia de épocas pasadas justifica a cabalidad las previsiones constitucionales y deontológicas. Hoy, ante el cuadro de disputas partidistas, las profundas pugnas políticas, el debate del derrotero o destino del país, la caracterización del fenómeno en el alza de la criminalidad como una controversia de índole política, y los ataques y críticas dirigidos contra nosotros los jueces —con razón y sin ella— *justifican una invitación a que reiteremos nuestra adherencia continua e incesante a los méritos de dichos principios.*" *Ortiz Angleró*, supra, pág. 102.

El buen juez, por vocación rechaza ser prisionero de las palabras, los extremos, las ideologías, el apasionamiento y el subterfugio del análisis histórico. Aborrece y combate la rutina, enemiga de la superación y excelencia. Resiste con entereza las presiones directas, las sutiles o las invisibles. No se deja seducir por sus sentimientos personales e ideas políticas. Como parte del delicado ministerio, asume su papel de garantizador de la independencia judicial, penetra su época y esculpe su propio molde de jurista con el cincel de una vida de acción y dedicación a la justicia.

La independencia judicial (o aquel estado permanente de garantías que permite que los jueces puedan dictar sus resoluciones sin más estímulos que los de su propia conciencia) puede frustrarse por causas subjetivas o por causas objetivas: a) Subjetivas: No todo el mundo tiene cualidades personales para ser juez: Además de vocación, el Juez ha de tener carácter, prudencia, entereza, valor, personalidad. Otra condición subjetiva del Juez es el entusiasmo permanente, el espíritu de trabajo, su constante sensibilidad ante los problemas. Es terrible el espectáculo del juez a quien se le ha hecho el callo profesional, ese agotamiento interno de las conciencias, el tipo indiferente y

abúlico dominado por una creciente pereza moral, que a la solución justa prefiere cada vez más la transacción porque ésta no turba la vida tranquila y porque la intransigencia exige demasiado trabajo. La indolencia, la desatención o la desgana son factores negativos cuando en la mayoría de los casos no está la verdad en la superficie de las cosas y hace falta un duro trabajo para descubrirla. Finalmente tiene una indudable relación con la independencia del juez su formación técnica. b) Causas objetivas: En gran parte, son correlativas con las anteriores: La prevaricación . . . la posibilidad de que una voluntad ajena tenga un poder arbitrario sobre las legítimas aspiraciones profesionales del juez; es preciso que el juez sepa sólo que en el ejercicio de sus funciones no tiene otro superior jerárquico que la ley, sino que, además, este principio, será una realidad absoluta en la práctica. Y finalmente, que el juez esté dotado de una holgura económica y de una consideración social que le inmunicen toda tentativa de soborno espiritual o material. B. Rull Villar, *La Independencia del Poder Judicial*, citado por Martínez Calcerrada en *Independencia del Poder Judicial*, 1970, pág. 77.

En esa misión, y en ausencia de modelo inspirador superior, el espíritu recto se fortalece en su intimidad por la dignidad del silencio, concepto eje de la ética judicial. El buen juez, pues, evita toda conducta que mine la confianza pública en la neutralidad del Poder Judicial. Sabe que la suspicacia es el elemento corrosivo más dañino y difícil de subsanar de la estabilidad, convivencia y paz social. Descubre a tiempo que la metamorfosis del abogado al jurista se produce y se consuma no sólo con la opinión correcta en derecho o el discurso académico, sino engalanada en una ejemplar conducta de moral, neutralidad y dignidad judicial.

Recordemos que "[e]n nuestro empeño de vigorizar mediante medios apropiados —en unión a los demás miembros de este Tribunal— la independencia judicial, su imparcialidad, y proclamar como convicción arraigada del espíritu, la excelsitud del imperio de la ética judicial, no cejaremos. Como otros, nuestra inspiración es, ha sido y será la judicatura. Su

infusión simplemente se deriva de 'que el verdadero Juez, cuya sentida vocación refuerza su capacidad de integridad, nunca hará dejación de su libre convicción porque tambalee su personal prestigio o futuro profesional' ''. Martínez, *op. cit.*, pág. 41. *Ortiz Angleró*, supra, pág. 106.

"Por lo demás, 'reconocemos las discusiones intelectuales, jurídicas y políticas —serias, histéricas y apasionadas— que generan controversias de esta índole. Como Tribunal colegiado nuestros fallos no están inmunes a la crítica, sea constructiva, sana, injusta o viciosa'." *P.I.P.* v. *E.L.A.*, supra, pág. 415. La naturaleza y dinámica humanas son fluidas y sumamente complejas. Así pues, en una sociedad pluralista existe todo tipo de personalidades —simplistas y complicadas, inteligentes y cerradas, objetivas y prejuiciadas, fanáticas y tolerantes— portavoces que responden a una gama de intereses ideológicos particulares o de grupos, tanto profesionales como partidistas. Dependiendo del grado de convulsión social y la crudeza de las luchas de las distintas tendencias en determinado momento, el abanico de percepciones erróneas o distorsionadas y voces hostiles, aun entre y contra personas honorables y de prestigio, varía.

Una vez más, "no podemos evitar pensar que esta ponencia suscite críticas o equívocos torpemente interpretados. Habrá quienes el simple abordar este tema les resultará ruborizante, mortificante o un tanto irritante. No es ese nuestro deseo. Tampoco será la primera ni última vez que el quehacer judicial genere tales reacciones". *Ortiz Angleró*, supra, págs. 105–106. Ninguna de esas u otras reacciones disonantes constituirán razones suficientes para el jurista abdicar su jurisdicción, empañar la nitidez de su óptica judicial, opacar la integridad de su ética o abjurar los dictados de su conciencia.

Ejemplarizantes por su contenido e interlocutor:

En su honrosa tradición de libertad de conciencia para juzgar, la Judicatura puertorriqueña no da fallos por simpatías políticas, ni por conveniencias políticas, ni por motivaciones

políticas, aunque sean fallos de interés político y aunque la consecuencia del derecho juzgado pueda no ser del agrado de las organizaciones políticas. L. Negrón Fernández, *Nuevas Fronteras del Derecho,* 6 de septiembre de 1979, pág. 8.

Como epítome, el único ideario que abraza, preconiza y rinde culto el juez es la JUSTICIA.

Revocaríamos la sentencia dictada y decretaríamos la inconstitucionalidad de la Ley Núm. 3 de 8 de septiembre de 1980, en las secciones cuyos extremos hemos analizado.([15])

([15]) Nada de lo expuesto en esta opinión debe entenderse como que afecta e impide la futura utilización del sistema de colegio abierto, implantado plena y totalmente con el mecanismo uniforme y universal de la tarjeta de identificación electoral.